UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

FIVE BOROUGH BICYCLE CLUB, et al.,

                    Plaintiffs,

          -against-                              07 Civ. 2448 (LAK)

THE CITY OF NEW YORK, et al.,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## OPINION

Appearances:

                Jeremy Feigelson
                Steve Vaccaro
                DEBEVOISE & PLIMPTON LLP
                *Attorneys for Plaintiffs*

                Gabriel Taussig
                Robin Binder
                Sheryl Neufield
                Michelle Goldberg-Cahn
                Assistant Corporation Counsel
                MICHAEL A. CARDOZO
                CORPORATION COUNSEL OF THE CITY OF NEW YORK
                *Attorneys for Defendants*

2

LEWIS A. KAPLAN, *District Judge.*

Life in this great city involves infinite conflicts between the desires of some to act and express themselves whenever, wherever, and however they wish and the desires of others for freedom from such behavior. The inescapable fact is that one person's freedom can be another person's burden or annoyance, often even where each is acting in entire good faith. The difficult task of municipal government is to strike appropriate balances that promote the general welfare and reconcile, so far as possible, the competing interests.

This case presents just such a conflict. Plaintiffs, advocates of large group bicycle rides through New York City (the "City"), claim that they should be free to ride in large groups wherever, whenever, and however they wish, free from municipal regulation. The City seeks to regulate these events by requiring permits that would enable the New York City Police Department (the "NYPD") to know where and when the groups will ride in order to facilitate the flow of traffic and protect the safety of all concerned. Plaintiffs contend that this infringes upon their constitutional rights to travel, expressive association, and free speech. They move here for a preliminary injunction prohibiting enforcement of the permitting scheme.

Having considered the evidence, the Court is not persuaded that plaintiffs – despite their good faith and earnestness – have met the high standard that must be satisfied before legitimate, content-neutral governmental actions that only incidentally affect the exercise of constitutional rights may be enjoined prior to trial.

*Facts*

I.    *Group Bicycle Rides*

By some estimates, 120,000 individuals ride bicycles through the streets of New York City every day.[1] Dozens of clubs and associations exist through which these cyclists can participate in the nearly 1,000 group bicycle rides that take place each year and that range in size from just a few to more than a thousand cyclists.[2]

A.    *Reasons for Riding in Groups*

Cyclists organize and participate in group rides for a variety of reasons, such as meeting and conversing with other cyclists or taking advantage of the enhanced safety that riding in numbers provides.[3] Some group rides are meant also to be educational. For example, plaintiff Five Borough Bicycle Club ("5BBC") organizes approximately 250 group bicycle rides each year, about five of which include 50 or more cyclists,[4] intended to promote "a greater understanding of the world and its people," as well as leadership, cooperation, and self reliance "through out-of-doors, educational and recreational travel."[5] For another, plaintiff Kenneth T. Jackson, a distinguished New York City historian and Columbia University professor, conducts an annual bicycle tour of the City

---

[1]    Simons Decl. ¶ 4.

[2]    Lieberman Decl. ¶ 8; Son Decl. ¶¶ 15, 19; Simons Decl. ¶ 24.

[3]    Blythe Decl. ¶¶ 12-13, 19; Nelson Decl. ¶ 13; Son Decl. ¶ 13.

[4]    Lieberman Decl. ¶¶ 7, 11.

[5]    DeFreitas Decl. ¶ 6 & Ex. A (5BBC by-laws).

for students and others, which has grown in size in recent years to include about 250 participants,[6] for the purpose of teaching participants about New York City culture and history.[7]

At least one group bicycle ride has a political message. So called "Critical Mass" rides take place in a number of cities across the country, including New York, on either the second or the last Friday of each month,[8] and can include over a thousand participants.[9] Cyclists such as plaintiffs Sharon Blythe, Josh Gosciak, Elizabeth Shura, Madeline Nelson, and Luke Son[10] participate in Critical Mass not only to meet other cyclists, but also to advocate for bicycling as a safe and clean alternative to driving cars.[11] Cyclists claim also to enjoy Critical Mass because of the ride's spontaneity and lack of a fixed route.[12] "Cyclists toward the front of the ride [are said to] make ad hoc decisions as to which direction to take based on which route they think will be safe or interesting, and often splinter groups will result because there is no requirement or process for reaching a consensus on a single route."[13]

---

[6] Jackson Decl. ¶¶ 1-3.

[7] *Id.* ¶ 2.

[8] In New York, a Critical Mass ride takes place in Brooklyn on the second Friday of each month, whereas a ride takes place in Manhattan on the last Friday. Son Decl. ¶ 12.

[9] *See id.* ¶ 16 (largest Critical Mass ride witnessed involved 1,200 cyclists).

[10] Blythe Decl. ¶ 11; Gosciak Decl. ¶22; Nelson Decl. ¶ 10; Shura Decl. ¶ 7; Son Decl. ¶ 13.

[11] *E.g.*, Gosciak Decl. ¶¶ 14-15; Nelson Decl. ¶¶ 11, 14; Son Decl. ¶¶ 8, 10.

[12] Son Decl. ¶ 14; Pucher Decl. ¶ 75.

[13] Son Decl. ¶ 14.

5

       B.      *Potential Hazards*

Although group ride participants argue that traveling in groups is safer for cyclists than traveling alone,[14] group bicycle rides endanger and inconvenience other users of public roadways. According to Lieutenant Caneco, a New York City police officer who has witnessed several Critical Mass rides[15] and whose evidence the Court credits, groups of approximately 50 or more bicycles "disrupt pedestrian and vehicular traffic, such that ordinary citizens who happen to be in the vicinity of the ride become trapped when the ride approaches."[16] Cyclists in groups of that size "tend to stay together and use the entire lane, thereby making it difficult for vehicles to pass the group, without cutting into oncoming traffic."[17] As explained by Lieutenant Gannon, a police officer who has coordinated parades in Manhattan,[18] "[w]hen a group of bicyclists travels together, there are no natural spaces between the bicyclists." Other vehicles, including nonparticipant cyclists, therefore have difficulty making turns or merging into lanes occupied by the group. "Thus, these vehicles will have to slow down and maneuver in such as way so as to try to get behind the group of bicyclists so that they can negotiate the lanes and make turns safely. Such maneuvering impacts on the flow of traffic and presents the potential for traffic accidents."[19]

---

[14]     *See* Pucher Decl. ¶¶ 21-29.

[15]     Caneco Decl. ¶ 1.

[16]     *Id.* ¶ 4.

[17]     *Id.*

[18]     Gannon Decl. ¶ 2.

[19]     *Id.* ¶ 14.

Moreover, some members of large groups of cyclists have been known to disregard traffic rules by running red lights, traveling along roadways where bicycles are prohibited, riding against the flow of traffic, and failing to use traffic signals, thus preventing pedestrians and vehicular traffic from predicting the cyclists' movements and crossing intersections safely.[20] Some Critical Mass participants have engaged in conduct called "corking,"[21] riding through traffic lights, taking up entire roadways, or dismounting their bicycles to block intersections so as to prevent cars from splintering the group or otherwise becoming entangled in its midst.[22]

Groups smaller than 50 present fewer problems. Their impact on traffic flow and safety is comparatively minor because of their relatively smaller sizes.[23] Both Lieutenants Caneco and Gannon agree, however, that groups smaller than 50 can pose significant traffic and safety issues as well.[24]

The Court accepts the evidence of both Lieutenants Caneco and Gannon that the problems associated with large group bicycle rides can be cured or greatly reduced by a permitting scheme that ensures that the police know a group's route in advance. Having advance knowledge of

---

[20]

Caneco Decl. ¶ 5; Gannon Decl. ¶¶ 13-14.

[21]

*E.g.*, Son Decl. ¶ 19.

[22]

*See* Caneco Depo. 92, 96 (corking involves "impeding traffic flow at the speed that's allowed, then dictating the speed" and "stopping red signals"); *Bray v. City of New York*, 356 F. Supp. 2d 277, 279 (S.D.N.Y. 2004) (describing the corking practice of Critical Mass participants); *see also* Critical Times: Sydney Critical Mass Newsletter, Jan. 19 1996 (available at http://www.dr-edg.f2s.com/cmass/cmevents/cmtimes/CTimes3.html) (last visited April 16, 2007).

[23]

*See* Caneco Decl. ¶ 5.

[24]

*See* Gannon Decl. ¶¶ 4-5; Caneco Depo. 163.

the timing and whereabouts of a group ride allows the police to reroute pedestrian and vehicular traffic if necessary, block off the group's route so that it may proceed unimpeded[25] and, of course, enforce traffic rules more effectively.

Furthermore, the impact of a group of 50 or more cyclists depends upon the streets being traveled, the number of lanes being occupied, the speed of the group, whether there is street construction nearby, the time and day of the week, and the number and size of other events taking place in the City at that time.[26] It is possible that some groups of that size will proceed safely and with no detrimental impact on traffic.[27] But context matters, and the NYPD is best able to minimize a group's impact by coordinating the group's movements with those of others on the road.[28] For example, as Lieutenant Gannon explained, several independent groups of 50 cyclists, each of which, taken alone, might have a small impact on traffic, may find themselves riding along the same or similar routes at the same time, thus concentrating and increasing their overall impact. The NYPD would be able to prevent this if it were able to coordinate the groups' movements.[29] In sum, a permitting scheme enables the NYPD to orchestrate the movements of various groups of different sizes and ensure that they proceed at times and places where their impact on each other, other users of the roadways, and the City as a whole is kept to a minimum.

---

[25] Caneco Decl. ¶ 6.

[26] Gannon Decl. ¶ 8.

[27] *Id.* ¶ 9; *see, e.g.*, Caneco Depo. 171-73.

[28] Gannon Decl. ¶ 10.

[29] *See id.* ¶ 9.

II.     *The Parade Regulations*

The City regulates parades, processions, and other mass gatherings that take place on public roadways through New York City Administrative Code § 10-110, and Title 38 of the Rules of the City of New York, Sections 19-01 through 19-04 (collectively, the "Parade Regulations"). This case concerns the latest amendment to the Parade Regulations to make them apply specifically to group bicycle rides of 50 or more participants.

A.     *Parade Permits and Applications*

The Parade Regulations provide in relevant part as follows:

"A procession, parade, or race shall be permitted upon any street or in any public place only after a written permit therefor has been obtained from the police commissioner. Application for such permit shall be made in writing, upon a suitable form prescribed and furnished by the [NYPD], not less than thirty-six hours previous to the forming or marching of such procession, parade or race"[30]

Parading without a permit is punishable by a fine of up to $25 and/or up to 10 days in jail.[31]

Permit applications must include, among other things, (1) the date, time, and route of the parade, (2) the locations and approximate times for formation and dismissal, (3) the number of participants, (3) the width of the roadway to be occupied by the event, and (4) the identity of a "chief officer," along with his or her address and telephone number.[32] The ordinance provides that the chief officer "shall be responsible for the strict observance of all rules and regulations included

---

[30]     N.Y.C. Ad. C. § 10-110(a).

[31]     *Id.* § 10-110(c).

[32]     38 R.C.N.Y. § 19-03(b)(2).

in said permit."[33]

Subject to exceptions not relevant here, the Police Commissioner is required to grant a parade permit, "after due investigation,"[34] unless there is "good reason to believe that the proposed procession, parade or race will be disorderly in character or tend to disturb the public peace,"[35] or if the application is incomplete, contains a material falsehood, or proposes an event that would (a) conflict with a previously approved event, (b) substantially or unreasonably interfere with traffic in the area contiguous to the parade route, (c) prevent proper fire and police protection or ambulance services, (d) violate the law, or (e) violate certain sections of the Penal Law and otherwise present an unreasonable danger to the health and safety of the public or damage public or private property.[36]

The Parade Regulations provide also that certain parade routes are off-limits. The Police Commissioner is required to deny applications that seek use of any public place between the hours of 9:00 a.m. and 6:30 p.m., except on Sundays and holidays, that ordinarily is "subject to great congestion or traffic and is chiefly of a business or mercantile character."[37] The Commissioner must deny also applications that propose use of Fifth Avenue in Manhattan unless the event in question

---

[33]  N.Y.C. Ad. C. § 10-110(a)(5).

[34]  *Id.* § 10-110(a).

[35]  *Id.* § 10-110(a)(1). Parades that will be "disorderly in character" or tend to "disturb the public peace" are those that propose activity that would violate certain sections of the Penal Law and "otherwise present an unreasonable danger to the health or safety of the applicant, parade participants or other members of the public, or cause damage to public or private property." 38 R.C.N.Y. § 19-01(a); *see also id.* § 19-04(d)(vi) (application must be denied on same grounds).

[36]  38 R.C.N.Y. § 19-04(d).

[37]  N.Y.C. Ad. C. § 10-110(a)(2).

was "held at that location prior to the promulgation of" the Parade Regulations.[38] "Special permits for occasions of extraordinary public interest," however, may be granted for any time and public place with the written approval of the mayor.[39] Such occasions are defined to include "celebrations organized by the City honoring the armed forces; sports achievements or championships; world leaders and extraordinary achievements of historic significance."[40]

When a parade permit is granted, it must "designate specifically the route through which the procession, parade or race shall move, and it may also specify the width of the roadway to be used, and may include such rules and regulations as the police commissioner may deem necessary."[41]

B.    "Parade or Procession"

1.    Prior Definition

Section 19-02 of the City Rules defines what constitutes a "parade or procession" requiring a permit.[42] Prior to January 26, 2007, a "parade or procession" was defined to include "any march, motorcade, caravan, promenade, foot or bicycle race, or similar event of any kind, upon any

---

[38]    38 R.C.N.Y. § 19-04(d)(viii). "Fifth Avenue" is defined to include Fifth Avenue in Manhattan south of 114 Street and north of 15 Street. *See* Binder Decl. Ex. A (notice of adoption of amendment to 38 R.C.N.Y. § 19-02).

[39]    N.Y.C. Ad. C. § 10-110(a)(4).

[40]    38 R.C.N.Y. § 19-01(b).

[41]    N.Y.C. Ad. C. § 10-110(a)(3).

[42]    38 R.C.N.Y. § 19-02.

11

public street or roadway." This definition was not to last.

In 2004, the NYPD for the first time attempted to enforce the Parade Regulations against group bicycle rides. Several group riders were arrested and charged with parading without a permit, which led to litigation in state court over the constitutionality of the Parade Regulations and their applicability to group bicycle rides. In one case, a court held that the parade regulations were unconstitutionally vague because they gave the Police Commissioner "unfettered discretion" to determine that "any particular event . . . fall[s] within the amorphous definition of parade or procession and, thus, requires a permit."[43] The court noted that the Parade Regulations' vagueness could be cured by making the definition of "parade or procession" more precise by "set[ting] forth the minimum number of participants to which [the permitting scheme] applies."[44]

In other cases, courts dismissed charges against cyclists of parading without a permit and denied an injunction sought by the City to prevent bicycle riding "*en masse*" without a permit on the ground that the Parade Regulations' definition of "parade or procession" did not apply to group bicycle rides.[45]

---

[43]

*People v. Bezjak*, 11 Misc. 3d 424, 433, 812 N.Y.S.2d 829, 837 (N.Y. Crim. Ct. N.Y. Co. 2006).

[44]

*Id.* at 436; 812 N.Y.S.2d at 839.

[45]

*See People v. Barrett*, 13 Misc. 3d 929, 821 N.Y.S.2d 416 (N.Y. Crim. Ct. N.Y. Co. 2006) (dismissing charges of parading without a permit and declining to reach issue of constitutionality of Parade Regulations); *City of New York v. Times' Up, Inc.*, 2006 WL 346491 (Sup. Ct. N.Y. Co. Feb. 14, 2006) (denying City's motion for preliminary injunction prohibiting bicycle rides "*en masse*" without permits).

In *Bray v. City of New York*, 346 F. Supp. 2d 480 (S.D.N.Y. 2004), plaintiffs moved for a preliminary injunction prohibiting the City from seizing bicycles of Critical Mass participants who were not charged with a crime or violation. The City cross-moved for a preliminary injunction prohibiting Critical Mass rides from occurring without permits.

2.      *Proposals to Amend*

In response to these holdings, the NYPD in July 2006 proposed amending Section 19-02 to clarify the definition of "parade or procession." The first proposal was to include in that definition "any procession or race which consists of a group of 20 or more vehicles, bicycles, or other devices moved by human power, or ridden or herded animals proceeding together upon any public street or roadway."[46]

When this proposal met with public opposition,[47] the NYPD in October 2006 proposed that "parade or procession" be defined to include "any procession or race which consists of a recognizable group of 30 or more vehicles, bicycles, or other devices moved by human power, or ridden or herded animals proceeding together upon any public street or roadway."[48]

Finally, on January 26, 2007, the NYPD announced that it would adopt a definition of "parade or procession" that would include "any procession or race which consists of a recognizable group of 50 or more pedestrians, vehicles, bicycles, or other devices moved by human power, or ridden or herded animals proceeding together upon any public street or roadway."[49] The

---

Judge Pauley declined to exercise supplemental jurisdiction over the City's cross motion and held that the motion nevertheless was barred by the doctrine of laches. *See id.* at 491-92. In *Bray v. City of New York*, 356 F. Supp. 2d 277, Judge Pauley again denied a motion by the City for a preliminary injunction on jurisdictional grounds.

[46]    Mathieu Decl. Ex A.

[47]    *See* Al Baker, *Police Move to Ease Proposed Rules on Permits for Protests*, NEW YORK TIMES, Aug. 19, 2006.

[48]    Mathieu Decl. Ex. B.

[49]    *Id.* Ex. C.

amendment to Section 19-02 became effective February 25, 2007, thirty days after publication.[50]


II.    *This Case*

      Plaintiffs commenced this action on March 27, 2007. They seek a preliminary injunction barring the City from enforcing the Parade Regulations as amended against group bicycle rides.[51] Plaintiffs contend that the regulations violate their rights to travel, free speech, and expressive association. They argue also that the regulations are unconstitutionally vague.


*Discussion*

I.    *Preliminary Injunction Standard*

      A party seeking a preliminary injunction ordinarily must show (1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor.[52] Where, however, a movant seeks to enjoin "government action taken in the public interest pursuant to a statutory or regulatory scheme," it may succeed only by demonstrating a likelihood of success on the merits in addition to irreparable

---

[50]

      *See* N.Y.C. Charter § 1043 (proposed agency rules must be published thirty days before effective date).

[51]

      The Court denied a temporary restraining order principally in consequence of plaintiffs' unreasonable delay in seeking it. *See* Tr., March 29, 2007, at 50-53.

[52]

      *E.g.*, *Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*, 427 F. Supp. 2d 491, 497 (S.D.N.Y. 2006) (quoting *Merkos L'inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*, 312 F.3d 94, 96 (2d Cir. 2002)).

harm.[53] Further, where "the injunction sought 'will provide the movant with substantially all the relief sought, and that relief cannot be undone even if the defendant prevails at a trial on the merits,' the moving party must make a 'clear' or 'substantial' showing of a likelihood of success."[54]

In this case, plaintiffs seek to enjoin the City from enforcing the Parade Regulations against group bicycle rides of 50 or more and "retaliating and selectively prosecuting the laws against [Blythe, Gosciak, Shura, Nelson, and Son] based on their participation in group bicycle rides, including . . . Critical Mass."[55] Plaintiffs thus seek to enjoin governmental action ostensibly taken in the public interest pursuant to a regulatory or statutory scheme. They therefore must demonstrate a likelihood of success on the merits in order to establish their right to a preliminary injunction.[56]

II.     Irreparable Harm

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."[57] Plaintiffs' allegation that a preliminary injunction

---

[53]

   *Million Youth March, Inc. v. Safir*, 18 F. Supp. 2d 334, 339 (S.D.N.Y. 1998) (quoting *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996)).

[54]

   *Irish Lesbian and Gay Org. v. Giuliani*, 918 F. Supp. 732, 740 (S.D.N.Y. 1996) (quoting *Jolly*, 76 F.3d at 473-74 (quoting *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33-34 (2d Cir.1995)) [hereinafter "*ILGO 1996*"].

[55]

   Cpt. at 33.

[56]

   *See, e.g.*, *Million Youth March*, 18 F. Supp. 2d at 339 (application for preliminary injunction ordering the City to permit the plaintiff to conduct a rally despite Parade Regulations sought to enjoin governmental action taken in the public interest pursuant to a regulatory scheme).

[57]

   *Id.* (quoting *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) (citing *New York Times Co. v. United States*, 403 U.S. 713 (1971)); *Bery v. City of New York*, 97 F.3d 689, 693 (2d Cir.

15

is necessary to forestall the imminent loss of their First Amendment freedoms ordinarily would suffice to establish a likelihood of irreparable harm.[58] The Court nevertheless must consider the impact of plaintiffs' delay in making their motion.

Undue delay in seeking interim relief undercuts the sense of urgency that ordinarily accompanies preliminary injunction motions and suggests that irreparable harm is not occurring or imminent.[59] In some cases, undue delay may justify denial of interim relief altogether.[60] Where the alleged irreparable injury is a prospective constitutional violation, however, "the question of plaintiff's delay is appropriately addressed under the rubric of laches, not the irreparable harm prong of the preliminary injunction standard."[61]

"Laches is an equitable doctrine applied to deny relief in the court's discretion when 'it is clear that a plaintiff unreasonably delayed in initiating an action and a defendant was prejudiced by the delay.'"[62] Plaintiffs filed this motion more than eight weeks after the NYPD announced that it would amend Section 19-02 to include group bicycle rides of 50 or more participants in the

---

1996) ("Violations of First Amendment rights are commonly considered irreparable injuries for the purposes of a preliminary injunction.")).

[58]

*Id.* (citing *ILGO 1996*, 918 F. Supp. at 739; *Irish Lesbian and Gay Org. v. Bratton*, 882 F. Supp. 315, 319 (S.D.N.Y. 1995)).

[59]

*See Weight Watchers Int'l., Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005).

[60]

*See Citibank, N.A. v. Citytrust*, 756 F.2d 273, 277 (2d Cir. 1985).

[61]

*Metro. Council, Inc. v. Safir*, 99 F. Supp. 2d 438, 441 (S.D.N.Y. 2000) (citing *Million Youth March*, 18 F. Supp. 2d at 340).

[62]

*Id.* (quoting *Robins Island Preserv. Fund, Inc. v. Southold Dev. Corp.*, 959 F.2d 409, 423 (2d Cir. 1992); citing *Million Youth March*, 18 F.Supp.2d at 340).

definition of "parade or procession" and more than four weeks after the amendment went into effect. Moreover, as the Court has noted, the City has suffered some prejudice by being forced to prepare for and contest litigation involving significant constitutional issues in a short period of time.[63] Nevertheless, while that delay was sufficient to justify denial of interim relief insofar as plaintiffs sought a preliminary injunction in connection with the March 30, 2007 Critical Mass ride, the Court is not persuaded that it warrants denial of interim relief altogether.

Unlike cases in which a plaintiff delayed in moving for a preliminary injunction in connection with a single, isolated event,[64] plaintiffs here seek an injunction in connection with an indefinite number of group bicycle rides that may take place in the future. The motion therefore need not be litigated before a fixed and imminent deadline after which the action will become moot. Furthermore, the Court granted the City additional time in which to submit affidavits,[65] thus giving it a full opportunity to oppose the motion. Accordingly, any prejudice the City may have suffered as a result of plaintiffs' delay has been cured. Plaintiffs should not be denied interim relief from possible constitutional violations simply because of their delay in seeking it.

III.     *Likelihood of Success on the Merits*

    A.     *Right to Travel*

---

[63]

    Tr., March 29, 2007, at 50-53; *see Million Youth March*, 18 F. Supp. 2d at 340.

[64]

    *See, e.g.*, *Nat'l Council of Arab Ams. v. City of New York*, 331 F. Supp. 2d 258, 265 (S.D.N.Y. 2004) (rally prior to start of 2004 Republican National Convention); *ILGO 1996*, 918 F. Supp. at 748 (parade on St. Patrick's Day); *WPIX v. League of Women Voters*, 595 F. Supp. 1484, 1494 (S.D.N.Y. 1984) (televised presidential debate).

[65]

    Tr., March 29, 2007, at 43-50.

"[F]reedom to travel throughout the United States has long been recognized as a basic right under the Constitution."[66] While the "right to travel" ordinarily refers to the right of a citizen to migrate freely from state to state,[67] the Second Circuit recognizes also a constitutional right to intrastate travel or "the right to free movement."[68] Any such right, however, is not unbounded.

---

[66]

    *Town of Southold v. Town of East Hampton*, 477 F.3d 38, 53 (2d Cir. 2007) (quoting *Dunn v. Blumstein*, 405 U.S. 330, 338 (1972)).

[67]

    *Id.* ("The right to travel encompasses at least three different components: '[i]t protects the right of a citizen of one State to enter and to leave another State, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and, for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State." (quoting *Saenz v. Roe*, 526 U.S. 489, 500 (1999)).

[68]

    *Ramos v. Town of Vernon*, 353 F.3d 171, 176 (2d Cir. 2003); *King v. New Rochelle Mun. Hous. Auth.*, 442 F.2d 646, 648 (2d Cir.), *cert. denied*, 404 U.S. 863 (1971); *see Spencer v. Casavilla*, 903 F.2d 171, 174 (2d Cir. 1990) ("[T]he Constitution . . . protects the right to travel freely within a single state.").

    The Supreme Court has not expressly embraced or rejected a constitutional right to intrastate travel, *Memorial Hosp. v. Maricopa County*, 415 U.S. 250, 255-56 (1974) (declining to decide issue), although it has cast doubt on whether such a right exists, *see id.* at 255 ("Even a bona fide residence requirement would burden the right to travel if travel meant merely movement."). As the District of Columbia Circuit has noted, while the Supreme Court on occasion has suggested that some right to free movement may exist, "those comments are only dicta – the cases involved travel across borders, not mere 'locomotion.'" *Hutchins v. District of Columbia*, 188 F.3d 531, 537 (D.C. Cir. 1999) (citing cases). Furthermore, the Court has made clear that the right to international travel is afforded less protection than the right to interstate travel, *see Haig v. Agee*, 453 U.S. 280, 306-07 (1981) (lower standard of review applicable to laws burdening international travel, as opposed to interstate travel), thus indicating that the right to move *across state borders* is fundamental, whereas the broader right to move about freely is not. *See Hutchins*, 188 F.3d at 537 ("Since the right to free movement would cover both interstate and international travel, *Agee* at least implies that the right recognized by the Court is decidedly more narrow.").

    Courts appear to be split on whether the Constitution contemplates a right of free movement, restriction of which would trigger strict scrutiny analysis. *Compare Wardwell v. Bd. of Educ.*, 529 F.2d 625, 627 (6th Cir. 1976) ("We find no support for plaintiff's theory that the right to intrastate travel has been afforded federal constitutional protection"), *Wright v. City of Jackson*, 506 F.2d 900, 901-02 (5th Cir. 1975) (Supreme Court precedent

When a statute or regulation has "[m]erely . . . an effect on travel," it does not "raise an issue of constitutional dimension."[69] "A statute implicates the constitutional right to travel when it actually deters such travel, or when impedance of travel is its primary objective, or when it uses any classification which serves to *penalize* the exercise of that right."[70] Furthermore, "travelers do not have a constitutional right to the most convenient form of travel, and minor restrictions on travel simply do not amount to the denial of a fundamental right."[71]

"A government intrusion on the right to travel will be upheld if the intrusion is deemed 'necessary to promote a compelling governmental interest.'"[72] "[G]overnmental restrictions upon freedom to travel are to be weighed against the necessity advanced to justify them, and a

---

did not support "the proposition that there is a fundamental constitutional 'right to commute' which would cause the compelling governmental purpose test . . . to apply" (citing *Ector v. City of Torrance*, 10 Cal. 3d 129, 109 Cal. Rptr. 849, (1973), *cert. denied*, 415 U.S. 935 (1974)), *with Johnson v. City of Cincinnati*, 310 F.3d 484, 496-98 (6th Cir. 2002) (recognizing fundamental "right to travel locally through public spaces and roadways"), *Lutz v. City of York,* 899 F.2d 255, 268 (3d Cir. 1990) (recognizing right to move freely through a state), *King*, 442 F.2d 646, 647-48 (2d Cir.1971) (durational residency requirements applied to in-state travelers treated the same as those applied to out-of-state travelers), *Cole v. Housing Auth. of Newport*, 435 F.2d 807 (1st Cir. 1970) (invalidating residency requirement as applied to in-state right travelers because right to intrastate travel assumed to have a constitutional source).

[69] *Soto-Lopez v. New York City Civil Serv. Comm'n*, 755 F.2d 266, 278 (2d Cir. 1985).

[70] *Id.* (internal citations and quotations omitted; emphasis in original).

[71] *Town of Southold*, 477 F.3d at 54 (quoting *Cramer v. Skinner*, 931 F.2d 1020, 1031 (5th Cir.1991) (internal alteration omitted); citing *Miller v. Reed*, 176 F.3d 1202, 1205 (9th Cir. 1999) ("[B]urdens on a single mode of transportation do not implicate the right to interstate travel."); *City of Houston v. F.A.A.*, 679 F.2d 1184, 1198 (5th Cir. 1982) (passengers do not possess "a constitutional right to the most convenient form of travel")).

[72] *Maxwell v. City of New York*, No. 93 Civ. 5834 (MBM), 1995 WL 244501, *7 (S.D.N.Y. Apr. 27, 1995) (quoting *Shapiro v. Thompson*, 394 U.S. 618, 634 (1969)).

restriction that burdens the right to travel too broadly and indiscriminately cannot be sustained.'"[73]

### 1.    Permit Requirement

Plaintiffs contend that the Parade Regulations violate the right to travel because they prohibit "travel on the public roadways in groups of 50 without advance approval of their route and destination by NYPD."[74] But requiring a permit to bicycle in large groups is not the same as forbidding or deterring travel or punishing someone for moving about. The Parade Regulations place no burdens on the rights of cyclists to ride through the streets of New York in groups of 49 or fewer. Nor do they prevent cyclists altogether from riding in groups of 50 or more. Cyclists are free to ride through the city in large groups so long as they first obtain a permit.

In *Campbell v. Westchester County*,[75] the plaintiff argued that his right to intrastate travel was infringed when he was prohibited from entering the Westchester Medical Center and its grounds without first informing the police. The court disagreed, holding that "[p]laintiff's right to travel was . . . not affected at all," as he still was able to go to the medical center and seek treatment so long as he notified the authorities in advance. "This may have made scheduling treatment more burdensome for plaintiff, but it did not make the travel associated with treatment more burdensome."[76]

---

[73]

> *Id.* (quoting *United States v. Davis*, 482 F.2d 893, 913 (9th Cir. 1971) (citing *Aptheker v. Sec. of State*, 378 U.S. 500, 508 (1964))).

[74]

> Cpt. ¶ 70.

[75]

> No. 96 Civ. 0467(JSM), 1998 WL 788791 (S.D.N.Y. Nov. 10, 1998).

[76]

> *Id.* at *1.

As in *Campbell*, the permit requirement here effectively mandates some planning of large group bicycle rides. But it does not make the act of bicycling in large groups more burdensome or difficult. The Parade Regulations therefore do not impede, deter, or punish travel throughout New York City. They simply require cyclists to notify the NYPD before they travel in groups of 50 or more.

### 2.     *Threatened Enforcement Tactics*

Plaintiffs argue also that they are deterred from exercising their right to travel because counsel for the City stated in 2004, during oral argument in a case concerning the constitutionality of the City's previous regulatory scheme, that "if this group [Critical Mass] doesn't get a permit, [the City will] stop this group from riding in its present form. . . . [b]y putting up netting, by keeping people out of the park, by keeping people from leaving the park."[77]

If the police actually were to use netting or other means to keep cyclists confined to a particular area, the right to travel perhaps would be implicated. But a three-year-old statement by a lawyer during oral argument about how the NYPD might have sought to enforce an obsolete statutory scheme does not show a likelihood that it actually will use that tactic in the future.

Moreover, to the extent plaintiffs seek to enjoin the use of netting in the future, they in all likelihood lack standing. There is no evidence that plaintiffs have had this enforcement tactic used on them in the past. Moreover, it is at best speculative that plaintiffs would (1) join a future group bicycle ride involving 50 or more participants, (2) violate the Parade Regulations by failing

---

[77]

Mathieu Decl. Ex. D (*Bray v. City of New York*, No. 04 Civ. 8255 (WHP), Tr., Dec. 9, 2004, at 223).

to obtain a permit, and (3) be prevented from traveling by the NYPD's use of netting. In other words, "it is no more than conjecture to suggest that in every instance of [an actual or attempted group bicycle ride], the police will act unconstitutionally. . . . And it is surely no more than speculation to assert . . . that [plaintiffs themselves] will . . . be involved in one of those unfortunate instances."[78]

If the City were to use unlawful enforcement methods and plaintiffs were to suffer constitutional violations as a result, they could seek redress under 42 U.S.C. § 1983 or other relevant statutes. This motion, however, is not the appropriate vehicle for the Court to consider the constitutionality of a hypothetical enforcement tactic that years ago was threatened by counsel in prior litigation.

B.   *Freedom of Association*

"While the freedom of association is not explicitly set out in the [First] Amendment, it has long been held to be implicit in the freedoms of speech, assembly, and petition."[79] The Supreme Court distinguishes between "freedom of intimate association," which concerns protecting "choices to enter into and maintain certain intimate human relationships . . . against undue intrusion by the State," and "freedom of expressive association," which involves the "right to associate for the purpose of engaging in those activities protected by the First Amendment – speech, assembly,

---

[78]   *City of Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983) (plaintiff lacked standing to challenge constitutionality of police use of choke holds during arrests where too much speculation was required to conclude that plaintiff would be the victim of a choke hold in the future).

[79]   *Healy v. James*, 408 U.S. 169, 182 (1972) (citing cases).

petition for the redress of grievances, and the exercise of religion."[80]

As with the right to travel, the right of association is not absolute. First, not all burdens on the right are of constitutional dimension. "[T]he government may engage in some conduct that incidentally inhibits protected forms of association."[81] "Though such inhibiting conduct might make it more difficult for individuals to exercise their freedom of association, this consequence does not, without more, result in a violation of the First Amendment. To be cognizable, the interference with associational rights must be 'direct and substantial' or 'significant.'"[82] Second, if a regulation places a constitutionally cognizable burden on the right of association, it nevertheless will be upheld if it was "adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms."[83]

### 1.    Group Bicycle Rides as Expressive Association

Plaintiffs argue that the Parade Regulations restrict their right to expressive rather than intimate association. Accordingly, the threshold issue is whether participation in group bicycle rides

---

[80]
> *Roberts v. United States Jaycees*, 468 U.S. 609, 617-18 (1984); *accord Chi Iota Colony of Alpha Epsilon Pi Fraternity* v. *City Univ. of New York*, 443 F. Supp. 2d 374, 382 (E.D.N.Y. 2006).

[81]
> *Fighting Finest, Inc. v. Bratton*, 95 F.3d 224, 228 (2d Cir. 1996) (citing *Lyng v. UAW*, 485 U.S. 360, 366 (1988); *Lincoln Federal Labor Union v. Northwestern Iron & Metal Co.*, 335 U.S. 525, 530-31 (1949); *Connecticut State Fed'n of Teachers v. Bd. of Educ. Members*, 538 F.2d 471, 481 (2d Cir. 1976)).

[82]
> *Id.* (citing *Lyng*, 485 U.S. at 366, 367 & n.5; *Younger v. Harris*, 401 U.S. 37, 51 (1971)); *see Boy Scouts of Am. v. Dale*, 530 U.S. 640, 650 (2000) (determining first whether law placed significant burden on association rights before conducting compelling interest test).

[83]
> *Boy Scouts*, 530 U.S. at 648 (quoting *Roberts*, 468 U.S. at 623).

constitutes expressive association protected by the First Amendment – that is, whether group bicycle riding must be regulated by reference to First Amendment jurisprudence.[84] To come within the First Amendment's ambit, "a group must engage in some form of expression, whether it be public or private."[85]

The City does not dispute that the group bicycle rides at issue here constitute expressive association. Indeed, Judge Pauley already has ruled on this issue with respect to Critical Mass. He held in *Bray v. City of New York*[86] that because "the rides are intended to promote the environmental and aesthetic benefits of alternative modes of transportation. . . . and to espouse a view on an issue of public import – namely, the environment," they fall within the wide net cast by the Supreme Court in defining expressive association.[87]

Furthermore, 5BBC's rides are intended to instill in participants "a greater understanding of the world and its people through out-of-doors, educational and recreational travel" as well as a sense of leadership, cooperation, and self reliance. Professor Jackson's educational rides are designed to teach students and others in the Columbia community about New York City culture and history. As the Supreme Court held in *Boy Scouts of America v. Dale*, participation in a group

---

[84]

Universal City Studios, Inc. v. Reimerdes, 111 F. Supp. 2d 294, 326 (S.D.N.Y. 2000) ("[T]o say that a particular form of expression is 'protected' by the First Amendment means that the constitutionality of any regulation of it must be measured by reference to the First Amendment."), *aff'd*, *Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001).

[85]

*Boy Scouts*, 530 U.S. at 648.

[86]

346 F. Supp. 2d 480 (S.D.N.Y. 2004).

[87]

*Id.* at 488 (citing *Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*, 229 F.3d 435, 443 (3d Cir. 2000) ("The Supreme Court has cast a fairly wide net in its definition of what comprises expressive activity.")).

24

whose "general mission" is to educate and instill values in young people qualifies as expressive association.[88]

### 2.    *Impact of the Parade Regulations*

The next question is whether the Parade Regulations impose a direct and substantial or significant burden on plaintiffs' association rights so as to trigger the compelling interest test.

### a.    *Group Size*

Plaintiffs claim that the Parade Regulations infringe their right to expressive association by "limiting the size of the group."[89] This misreads the regulations. The ordinance simply requires groups of 50 or more to obtain permits before traveling together through public places. It does not prevent groups of certain sizes from associating with one another or bicycling through New York City. As will appear, the Court finds that plaintiffs have not established a likelihood of success in proving that the permit requirement is a direct and substantial burden on the exercise of their associational rights.

### b.    *Fifth Avenue Restriction*

Plaintiffs next argue that the Parade Regulations inhibit association by prohibiting the use of portions of Fifth Avenue by groups of 50 or more. This is unpersuasive. The prohibition does

---

[88]

530 U.S. at 649-50.

[89]

Pl. Mem. 34.

not impair the ability of Critical Mass participants to ride together and demonstrate their commitment to the environment and alternative methods of transportation. Nor does it prevent 5BBC from conducting group rides that promote world knowledge and leadership. Moreover, while Fifth Avenue may be home to many important historical sites that are central to Professor Jackson's educational program,[90] the Parade Regulations do not prevent Professor Jackson from guiding his bicycle tours past these sites by taking alternative routes. No evidence suggests that the sites he ordinarily views from Fifth Avenue could not be viewed from other streets.[91]

The most that can be said is that the Fifth Avenue restriction makes group rides of 50 or more cyclists less convenient by foreclosing passage through one of New York's thoroughfares. But imposing an inconvenience on expressive association is far from imposing a direct and substantial or significant burden.[92]

c.     Predetermined Routes

Finally, plaintiffs contend that the requirement that permit applications specify the

---

[90]

See Jackson Decl. ¶¶ 4-5 (bicycle groups travel down Fifth Avenue to view New York Public Library, Madison Square Park, the Flat iron Building, and the Madison Green Building).

[91]

Professor Jackson stated himself that "there are obviously alternative routes downtown." Id. ¶ 5.

[92]

See Lyng, 485 U.S. at 366 (government may refuse to provide food stamp benefits to striking workers); Lincoln Fed. Labor Union, 335 U.S. at 530-31 (state may enforce open-shop law, even though union asserted that closed shop was indispensable to right of self-organization); Fighting Finest, Inc., 95 F.3d at 228 (city may withdraw official recognition of boxing team sponsored by police officers' association and prohibit association from posting notices of its boxing matches in police precincts and facilities); Connecticut State Fed'n of Teachers, 538 F.2d at 481 (state may deny teachers' union right of access to school mailboxes, bulletin boards, and meeting rooms)).

route group rides will take stifles the spontaneity that characterizes Critical Mass and some 5BBC rides.[93] They argue that spontaneity is an "an important aspect of expressive association among bicyclists."[94]

Plaintiffs point to no evidence indicating that spontaneity is a crucial element of 5BBC's message or a necessary means of expressing it. They cite one cyclist's affidavit stating that the absence of fixed routes is an attractive feature of some 5BBC group rides.[95] But being an attraction and being an important component of expressive association are two different things. The Constitution protects the freedom of individuals to associate with one another for expressive purposes, not the right to use the most attractive, enjoyable, or convenient means of association.

Plaintiffs do offer evidence that spontaneity is central to the message expressed by Critical Mass rides that bicycles are a viable alternative to cars and have an equal right to the road. According to one regular Critical Mass participant, "[i]f police were directing Critical Mass rides, the message would be completely different – perhaps, that bicyclists need the police to make their way, or that the police were there to protect the rest of the City from the bicyclists."[96] This is unavailing, however. The Parade Regulations make no distinction between bicycles and cars. A group of 50 or more cars is required to follow a predetermined route as is a group of 50 or more

---

[93]

      Professor Jackson's annual tour of the City follows a different predetermined route each year. Jackson Decl. ¶ 4. This argument therefore does not apply to Professor Jackson's group rides.

[94]

      Pl. Mem. 34.

[95]

      Ravin Decl. ¶ 11.

[96]

      Nelson Decl. ¶ 18.

bicycles. The Parade Regulations if anything reinforce the message that bicycles have an equal right to the road.

While the predetermined route requirement may dissuade some cyclists from participating in group rides of 50 or more,[97] it does not prevent individuals from joining those rides if they choose to do so.[98] Accordingly, the most that can be said is that the predetermined route requirement inconveniences cyclists and perhaps makes group rides of 50 or more less attractive or enjoyable than they otherwise would be. It does not impose a direct and substantial or significant burden on cyclists' right to engage in expressive association.

C.    *Free Speech*

Public roadways are traditional public fora for the exercise of First Amendment rights.[99] "Thus, while it is beyond dispute that municipalities have the right 'to regulate the use of city streets and other facilities to assure the safety and convenience of the people in their use,'"[100] "that right may not be exercised so as to abridge or deny First Amendment rights."[101]

---

[97]    *See id.* ("I would not participate in Critical Mass if it was required to have a fixed route").

[98]    *See Fighting Finest, Inc.*, 95 F.3d at 228 (no violation of right to expressive association where defendant "did not 'prevent' the [plaintiffs] from associating together nor burden in any significant manner their ability to do so.").

[99]    *Million Youth March*, 18 F. Supp. 2d at 341 (citing *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 152 (1969); *Hague v. C.I.O.*, 307 U.S. 496, 515-16 (1939)).

[100]    *Id.* (quoting *Cox v. Louisiana*, 379 U.S. 536, 554 (1965)).

[101]    *Id.* (citing *Hague*, 307 U.S. at 516).

"[W]hen 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms."[102] "The critical point is that nonspeech elements may create hazards for society above and beyond the speech elements. They are subject to regulation in appropriate circumstances because the government has an interest in dealing with the potential hazards of the nonspeech elements despite the fact that they are joined with expressive elements."[103]  The Supreme Court therefore has held that the government may impose reasonable restrictions on the time, place, or manner of speech and expressive conduct,[104] "provided the restrictions '[1] are justified without reference to the content of the regulated speech, [2] that they are narrowly tailored to serve a significant governmental interest, and [3] that they leave open ample alternative channels for the communication of the information.'"[105]

### 1.    Bicycle Riding as Speech

The threshold issue once again is whether group bicycle rides constitute expression

---

[102]

United States v. O'Brien, 391 U.S. 367, 376 (1968).

[103]

Universal City Studios, 111 F. Supp. 2d at 328.

[104]

See Million Youth March, 18 F. Supp. 2d at 341 n.45 (analysis differs little if at all when government seeks to regulate expressive conduct as opposed to pure speech (citing O'Brien, 391 U.S. at 376-77; Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 298 (1984))).

[105]

Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (quoting Clark, 468 U.S. at 293 (1984)).

such that they must be regulated by reference to First Amendment jurisprudence.[106] In many circumstances, the act of riding a bicycle is unrelated to expression. People ride their bicycles simply because they find that to be an enjoyable, convenient, or cost effective means of traveling, not because they wish to convey an idea. In those cases, bicycle riding is pure conduct. But bicycle riding can combine speech and non-speech elements. Critical Mass participants, for example, ride bicycles to express the idea that there are viable and environmentally friendly alternatives to cars.[107] Accordingly, it cannot be said that group bicycle riding always is pure conduct that may be regulated without reference to First Amendment concerns.[108]

---

[106]

    *Universal City Studios*, 111 F. Supp. at 326.

[107]

    Arguably, Professor Jackson's bicycle tour of New York City is not expressive in the sense that Professor Jackson or his students intend to express a message by the act of bicycling. That is, participants exchange ideas with one another about the history and culture of New York while they happen to be on bicycles. Those ideas could be expressed in the classroom, on a bus, in a car, or while walking. *See* Jackson Decl. ¶ 6 (other modes of transportation could be used but are less desirable); *but see id.* ¶ 8 ("[O]nlookers view us as making a statement in favor of bicycling in New York City."). The same arguably could be said of 5BBC rides as well. 5BBC potentially could teach its clients about leadership, self reliance, and world knowledge without taking them on bicycle rides.

    The Court need not decide whether Professor Jackson's or 5BBC's rides amount to expressive conduct, however, as group bicycle riding as a whole is an activity that carries the potential for expression and therefore must be regulated with reference to First Amendment doctrine. And in any event, as will become clear, regardless of the expressiveness of these rides, the Parade Regulations do not violate the First Amendment.

[108]

    *See O'Brien*, 391 U.S. 367 at 376-77 (burning a draft card may have expressive elements that are subject to First Amendment protection); *accord Universal City Studios*, 111 F. Supp. 2d at 326 (computer code may be both functional and expressive).

2.      *Content Neutrality*

"The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys."[109] "The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others."[110]

Plaintiffs do not appear to contend that the Parade Regulations are anything other than content neutral. Their memorandum states in passing that the regulations are content-based, but points to no evidence and makes no arguments to support this contention.[111] In any event, it is clear that the Parade Regulations have "nothing to do with content."[112] The City's stated purpose in enacting them was to ensure the orderly usage of public streets by processions of large groups of pedestrians, vehicles, bicycles, or animals, which have the potential to disrupt traffic flow and endanger other users of public roadways.[113] Concerns about traffic flow and safety arise, and the Parade Regulations apply, regardless of the purpose or intended message of a particular "parade or procession." The regulations therefore were not adopted because of the City's disagreement with the

---

[109]
       *Ward*, 491 U.S. at 791 (citing *Clark*, 468 U.S. at 295).

[110]
       *Id.* (citing *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47-48 (1986)).

[111]
       *See* Pl. Mem. 36.

[112]
       *Ward*, 491 U.S. at 792 (quoting *Boos v. Barry*, 485 U.S. 312, 320 (1988)).

[113]
       Def. Mem. 15; Binder Decl. Ex. A (statement of basis and purpose for amendment to 38 R.C.N.Y. § 19-02).

messages potentially conveyed by group bicycle rides.[114]

### 3.      Narrow Tailoring

Plaintiffs do not dispute that the City has a valid and substantial interest in securing

the orderly use of public roadways to ensure the safety and convenience of travelers.[115] The real issue

then is whether the Parade Regulations are narrowly tailored to achieve that end.

A content-neutral time, place, or manner regulation "need not be the least restrictive

or least intrusive means of"advancing a substantial government interest.[116] "Rather, the requirement

of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government

interest that would be achieved less effectively absent the regulation.'"[117] The burden of

demonstrating that a law is constitutional is on the government.[118]

As the declarations of Lieutenants Caneco and Gannon show, groups of 50 or more

---

[114]

     *See Ward*, 491 U.S. at 792 (regulation requiring performers in bandshell to use city-provided sound equipment and city-retained sound technicians had nothing to do with content where the city's primary aim was to control noise and prevent audiences from becoming upset and unruly due to poor sound quality).

[115]

     *See, e.g.*, *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 650 (1981) ("As a general matter, it is clear that a State's interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective." (citing *Grayned v. City of Rockford*, 408 U.S. 104, 115 (1972); *Cox v. New Hampshire*, 312 U.S. 569, 574 (1941)).

[116]

     *Ward*, 491 U.S. at 798.

[117]

     *Id.* at 799 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)); *accord Universal City Studios*, 111 F. Supp. 2d 294, 330.

[118]

     *See, e.g.*, *Eastern Connecticut Citizens Action Group v. Powers*, 723 F.2d 1050, 1052 (2d Cir. 1983).

bicycles can and often do disrupt the orderly flow of traffic and endanger other travelers. Large groups tend to ride aggressively, disobey traffic rules, and block intersections. Those that do not nevertheless have a tendency to impede traffic due to their size alone. A permit scheme ensures that the police have advance notice of the group's whereabouts so that they may block off the intended route from vehicular and pedestrian traffic, enforce traffic regulations more effectively, and coordinate the movements of all large groups proceeding in the City at a given time so as to minimize there overall impact.

Plaintiffs nevertheless contend that the Parade Regulations are not narrowly tailored.

### a.     *Fifty-Person Threshold*

Plaintiffs concentrate their constitutional attack primarily on the Parade Regulations' 50-person threshold. They contend that this threshold is arbitrary and lower than necessary to achieve the City's substantial interests.

### (1)     *Earlier Proposals*

Plaintiffs point first to the fact that the NYPD initially proposed more restrictive 20- and 30-person thresholds, but settled on the less restrictive 50-person threshold after the earlier proposals met with public opposition. According to plaintiffs, this shows that the City's choice of a 50-person threshold was motivated by the desire to thwart group bicycle rides while producing the least public outcry and that the threshold it chose is not narrowly tailored to serve a substantial government interest.

This is unavailing. The City is not prohibited from taking public opinion into account

when passing regulations. It is forbidden only to pass a law that does not further a substantial government interest that would not be well served in its absence. Furthermore, the fact that the City ultimately adopted less restrictive regulations than it proposed initially does not demonstrate that the Parade Regulations are not narrowly tailored. It shows at most that the City believed it could advance its interests by less restrictive means than it originally thought necessary. If the City initially had proposed *less* restrictive measures and then adopted a *more* restrictive regime, this perhaps would have shown that the City believed it could accomplish its goals through less restrictive means. But that is not what happened.

### (2)      Past Practice

Plaintiffs next argue that the 50-person threshold is overly restrictive because the NYPD in the past has allowed group rides of 50 or more to proceed without permits. The 50-person threshold, according to plaintiffs, therefore "has been empirically proven unnecessary."[119]

This, too, is unpersuasive, at least for the present. Simply because large group rides took place in the past without police interference does not mean that those rides did not disrupt traffic or threaten the safety of other travelers, or that future rides will not impose the same dangers. Moreover, to the extent the police were able to manage prior group rides, this does not show that the NYPD would not be substantially better able to minimize the hazards associated with group rides or answer the vast demands it faces on scarce law enforcement resources by eliminating the need to guess the timing, whereabouts, and intended routes of large group bicycle rides.

Plaintiffs cite several cases for the proposition that a regulation is not narrowly

---

[119]      Pl. Mem. 41.

tailored "when it has been shown that the government sanctioned activity beyond the numerical limits prescribed in the policy."[120] But these cases are inapposite. They involved situations where the government enacted a regulation and subsequently made exceptions to it, thus belying the government's belief that it could afford to be less restrictive while still furthering its substantial interest,[121] or where past incidents demonstrated that no public danger or nuisance actually would occur in the absence of government regulation.[122] Here, by contrast, there is no evidence that the government has strayed from its 50-person policy since enacting it in February. Moreover, as Lieutenants Caneco and Gannon stated in declarations that the Court credits, large group bicycle rides in the past in fact have impeded traffic and endangered other travelers.

(3)     *Impact of Large Group Bicycle Rides*

Plaintiffs contend nevertheless that the Parade Regulations are unnecessary because

---

[120]

   *Housing Works, Inc. v. Safir*, No. 98 Civ. 4994 (HB), 1998 WL 409701, *3 (S.D.N.Y. July 21, 1998).

[121]

   *See Bery v. City of New York*, 97 F.3d 689 (street vendor licencing scheme not narrowly tailored to prevent street congestion where government made exceptions to the numerical limit set on licenses by granting additional licenses to certain individuals and groups after enactment).

[122]

   *See Housing Works, Inc. v. Safir*, 101 F. Supp. 2d 163 (S.D.N.Y. 2000) (50-person limit on demonstrations in plaza outside City Hall not narrowly tailored to interest of keeping building entrance clear where larger rallies took place in the past without blocking entrance and other evidence established conclusively that area could accommodate larger groups); *United Yellow Cab Drivers Ass'n, Inc. v. Safir*, No. 98 Civ. 3670 (RPP), 1998 WL 274295, *3 (S.D.N.Y. May 27, 1998) (regulation limiting number of taxis in procession to 20 not narrowly tailored to government interest of preventing traffic disruption where larger processions of taxis had taken place in the past).

group bicycle rides of 50 or more "enhance safety and do not disrupt traffic."[123] They rely primarily on the declaration of John Pucher, a professor of urban studies and expert on urban transportation planning and policy issues.

According to Dr. Pucher, cyclists traveling in large groups are more visible both to pedestrians and motorists. Hence, group riding tends to decrease the number of collisions and increase safety both for cyclists and pedestrians.[124] Dr. Pucher states also that group bicycle riding does not disrupt traffic because bicycles are smaller than vehicles. A group of 50 bicycles therefore causes less congestion than a group of 50 cars.[125]

Even accepting Dr. Pucher's assertions *arguendo*, the Court is not persuaded that the Parade Regulations are unnecessary to further a substantial government interest. Large groups of cyclists may be more visible than individual cyclists and may take up less space than large groups of vehicles, but their lack of predictability nevertheless may endanger other travelers as well as disrupt orderly traffic flow, and their presence may add traffic volume that otherwise would be absent. A permit requirement allows the government to avoid these hazards by making the movement of group bicycle rides more orderly and predictable and rerouting other traffic such that collisions with bicycles are even less likely to occur than otherwise would be the case.

For the same reasons, plaintiffs' argument that the Parade Regulations are unnecessary because group bicycling can be managed by ordinary traffic rules is unavailing. If, as Lieutenants

---

[123]

Pl. Mem. 41.

[124]

Pucher Decl. ¶¶ 24, 31.

[125]

*Id.* ¶¶ 47, 51, 53.

Caneco and Gannon state, individual group cyclists on occasion do not obey traffic rules precisely because they travel in groups – for example, by "corking" intersections or running red lights in order to stay together – then ordinary traffic rules plainly are not sufficient. The NYPD's permitting scheme gives police advance notice of group bicycle ride routes so that police are better able to enforce the rules of the road.

### (4)     *Lieutenant Caneco's Statements*

Finally, plaintiffs argue that Lieutenant Caneco's statement that groups of 50 or more cyclists present traffic and safety problems should not be credited. They point to the fact that Lieutenant Caneco stated in an affidavit prepared in connection with *City of New York v. Times' Up, Inc.* that the disruption of pedestrian and vehicular traffic is minimal when groups smaller than 100 disobey traffic regulations.[126]

Lieutenant Caneco explained this apparent inconsistency in a deposition conducted on April 5, 2007. He stated that he since has changed his belief based on more recent observations and that in 2005, groups of 100 were relatively small compared to other rides that took place at the time. He meant only that the disruptions caused by 100-person and smaller groups were "minimal" by comparison. Now that he has witnessed the behavior of even smaller groups, Lieutenant Caneco stated, he has formed the belief that groups as small as 25, perhaps smaller, have the potential to disrupt traffic.[127]

The arguable inconsistency in Lieutenant Caneco's affidavits perhaps leaves room

---

[126]     Caneco Depo. Ex. 3, ¶ 11.

[127]     Caneco Depo. 162-64; *id.* at 81 (impact of 100 cyclists minimal when "compared to 1,000").

to doubt whether he believes a 50-person threshold is more appropriate than, say, a 100-person threshold. But Lieutenant Caneco's statements are not completely irreconcilable. This especially is so in light of the fact that they were made approximately a year and a half apart and that Lieutenant Caneco had more of an opportunity to observe groups of cyclists smaller than 100 during that time.[128]

Any inconsistency in Lieutenant Caneco's affidavits, however, in all likelihood does not matter. Lieutenant Gannon stated in his declaration that groups of bicycles smaller than 50 potentially pose traffic and safety problems, but that the 50-person threshold "was reached after balancing the City's safety concerns with the concerns voiced by the public regarding the need to apply for permits for each and every small procession taking place in the City."[129] He added that groups of 50 or more "are likely to have an impact on vehicular and pedestrian traffic, thereby raising concerns about the safety" of other travelers.[130] "A group of fifty people traveling together by bicycle or vehicle is likely to create a 'moving column,' thereby blocking the roadway" because groups of that size, "whether traveling across the entire width of the roadway or lined up on [*sic*] groups of two, tend to try to stay together and disregard traffic regulations in order to do so."[131] Moreover, even groups of 50 who obey traffic regulations potentially impede traffic. Because of their sheer size they

---

[128]

See *id.* at 39 ("I had the opportunity to observe all different size groups."); *id.* at 50 ("I have seen groups of approximately 50 ride along without any . . . problems for a while and then . . . they tend to break the law by riding through the red lights).

[129]

Gannon Decl. ¶ 7.

[130]

*Id.* ¶ 11.

[131]

*Id.* ¶ 13.

38

can prevent other vehicles on the road from merging or turning.[132] And absent coordination with other groups of cyclists, they might unexpectedly merge with those groups, thus increasing their size and overall impact on traffic.[133]

Having considered the arguments pro and con as well as Lieutenant Caneco's deposition testimony, and having considered also Lieutenant Gannon's declaration, the Court finds that the 50-person threshold furthers a substantial government interest that would be less well served by, for example, a 100-person threshold.[134]

### b.     24-Hour Applicability

Plaintiffs next attack the Parade Regulations on the ground that they apply to all group bicycle rides of 50 or more regardless of when they take place. According to plaintiffs, "[b]lanket, round-the-clock route restrictions on group bicycle rides are inappropriate because some rides, like Jackson's, are held late at night when there is little or no traffic."[135] But the argument overstates the City's burden.

Certainly a permitting scheme that took account of traffic patterns on every possible route at every possible time of day would be a less restrictive means of advancing the City's

---

132

     *Id.* ¶ 14.

133

     *Id.* ¶ 9.

134

     There is no need for an evidentiary hearing in light of the fact that Lieutenant Caneco's statements present no necessary inconsistency, particularly as the Court would reach the same result even if his evidence were disregarded entirely.

135

     Pl. Mem. 45.

substantial interests. The Parade regulations, however, need not be drawn so narrowly. They need only advance a substantial interest that would be less well served in their absence. Plaintiffs offer no evidence to suggest that no area in New York City experiences vehicular or pedestrian traffic at night. The City's permit scheme therefore ensures that the NYPD can take appropriate precautions in the event that a proposed route were to include an area that was expected to experience late-night traffic.

       *c.*     *Fifth Avenue Restriction*

Plaintiffs argue also that the Fifth Avenue restriction is inappropriate because Fifth Avenue "is the safest and most desirable on-street southbound route for most group bicycle rides" and that "banning group bicyclists from [Fifth Avenue] only imposes added danger on them without serving any useful purpose."[136] This is unavailing.

First, when police know in advance what route a large group of cyclists will take, they are able to block off the route and redirect other traffic. This, if anything, would improve the safety of cyclists traveling along streets other than Fifth Avenue.

Second, while groups of cyclists might proceed safely down Fifth Avenue, this does not mean that they do not endanger pedestrians and motorists or otherwise disrupt traffic. Keeping large groups off Fifth Avenue protects other users of the avenue and thus does not fail to serve "any useful purpose."

       *d.*     *Frequency of Group Bicycle Rides*

---

[136]    Pl. Mem. 45.

Plaintiffs contend that the permitting scheme "burdens bicyclists far more heavily than organizers of annual parades or ad-hoc political demonstrations, for no apparent purpose," because group bicycle rides occur more frequently than traditional parades.[137] This misses the point. The more frequently large group bicycle rides occur, the more frequently the City's substantial interest in ensuring the orderly and safe use of its roadways potentially is implicated. While group cyclists may desire a regulation that better accommodates their desires, this does not make the Parade Regulations unconstitutional. As noted, the narrow tailoring requirement does not require the City to use the least restrictive means to further its substantial interests, nor does it require the City to tailor its regulations to each potential speaker's unique circumstances and preferences.

e.    The "Chief Officer" Requirement

Finally, plaintiffs argue that the requirement that parade permit applicants designate a "chief officer" is overly burdensome. They claim that this requirement will deter potential organizers of large group rides from applying for permits because they will be fearful of taking legal responsibility for the actions of other riders.

At oral argument, the City explained that the "chief officer" designated in a permit application is not responsible legally for the actions of other cyclists but rather is intended to be a point person with whom the police can discuss in a meaningful way how the proposed event is going to be handled.[138] The City represented also that it would change the permit application form to clarify

---

[137]    *Id.*

[138]    Tr., March 29, 2007, at 26; *see also id.* at 9-10.

this, thus eliminating the possibility that a potential applicant would be deterred from seeking a parade permit.[139] Accordingly, plaintiffs' argument is moot.

Even absent this representation by the City, plaintiffs' argument still would fail. Generally, "[i]mposing criminal liability for the acts of another offends substantive due process."[140] If the Parade Regulations were interpreted to impose liability on a chief officer for the actions of other cyclists, they in all likelihood would be unconstitutional. The Parade Regulations nevertheless easily are susceptible to the interpretation proffered by the City during oral argument, which would dispel the spectre of unconstitutionality. Where a statute is susceptible to two possible interpretations, one of which renders the law unconstitutional and the other of which does not, a court must adopt the constitutional construction.[141] Plaintiffs' interpretation of the Parade Regulations therefore must be rejected. Accordingly, as the Parade Regulations grant the City no authority to prosecute chief officers for the conduct of other cyclists, it cannot be said that the permit application form reasonably can be interpreted to threaten such prosecution and therefore deter

---

[139]

*Id.* 26-27.

In that vein, the City stated also that it would change the application form to clarify that the applicant need not specify the measured width of the roadway to be occupied, *see* 38 R.C.N.Y. § 19-03(b)(2)(vii), but only the number of traffic lanes expected to be occupied by the group procession, Tr., March 29, 2007, at 26.

[140]

*Bryant v. City of New York*, No. 99 Civ. 11237 (LMM), 2003 WL 22861926, *8 (S.D.N.Y. Dec. 2, 2003) (citing cases).

[141]

*E.g.*, *United States v. Monsanto*, 924 F.2d 1186, 1200 (2d Cir.) (*en banc*) (citing cases), *cert. denied*, 502 U.S. 943 (1991); *accord Nat'l Ass'n of Indep. Insurers v. State*, 89 N.Y.2d 950, 952, 655 N.Y.S.2d 853, 854 (1997) (citing *Alliance of Am. Insurers v. Chu*, 77 N.Y.2d 573, 585, 569 N.Y.S.2d 364, 370 (1991)).

expression.[142]

\*      \*      \*

The Parade Regulations, like all prophylactic measures that draw numerical lines,

inevitably are overinclusive.[143] Not every group bicycle ride of 50 or more participants necessarily

will disrupt traffic, endanger other travelers, or disobey traffic regulations.[144] Nevertheless, the

NYPD has observed that group bicycle rides of that size can and do present such risks and concluded

---

[142]

      *See Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983) (comment by public official discouraging stores from selling certain board game could not reasonably be interpreted as a threat of punishment for exercise of First Amendment rights where official's employer lacked "the power to impose sanctions on merchants who did not respond to [the official's] requests.").

[143]

As one court aptly has noted,

      "[T]hough strict scrutiny must, of course, be strict, it must, at least in some instances, be applied with limited deference to the decisionmaker's exercise of judgment. If we pretend that it is otherwise, we adopt a model for strict scrutiny under which no state's attempt to deal with certain problems can survive, and so very real and dangerous problems must be left unaddressed. Every place where the line is drawn is arguably either overinclusive, because too much activism is restricted, or underinclusive, because too much threat to judicial open-mindedness is tolerated. The courts then occupy the enviable position of not being required to say in advance what line would be permissible, but of being privileged to veto every possible legislative attempt to draw the line because it would have been possible to draw the line somewhere else. If strict scrutiny is simply a way to strike down laws, in which any law is doomed as soon as we invoke strict scrutiny, it is a charade." *Republican Party of Minnesota v. White*,  416 F.3d 738, 786 (8th Cir. 2005).

While the "substantial interest" test that applies here is called "intermediate scrutiny," *e.g.*, *Vincenty v. Bloomberg*, 476 F.3d 74, 84 (2d Cir. 2007), the Eighth Circuit's point nevertheless is apposite.

[144]

      *See, e.g.*, Caneco Depo.

that police would be able better to prevent safety hazards and enforce traffic regulations if they knew in advance where and when large groups of cyclists were riding. It therefore chose to enact its permitting scheme, which does not forbid cyclists from traveling in large groups, but simply requires them to notify the police in advance of their intended routes.[145]

In the last analysis, the Court is not persuaded that plaintiffs are likely to prove that the Parade Regulations are unnecessary to further a significant government interest, or that that interest would not be served less effectively in their absence. Indeed, as Judge Pauley noted in *Bray v. City of New York*, large groups of cyclists "cannot simply go 'wherever their wheels take them' month after month without someone getting hurt." At some point, bicycle rides of a certain magnitude "require coordination with the police for everyone's safety."[146]

### 4.    *Ample Alternative Channels*

The final requirement, that the Parade Regulations leave open ample alternative channels of expression, is easily met. The regulations do not ban group bicycle riding on public roads. Nor do they have any "effect on the quantity or content of that expression."[147] And while they do provide that groups of 50 or more may not bicycle together on much of Fifth Avenue, the regulations leave all other roads in New York City open to cyclists in most circumstances. Plaintiffs perhaps have shown that these remaining avenues of communication are less convenient and

---

[145]    *Id.* at 492.

[146]    346 F. Supp. at 492 (discussing Critical Mass rides involving several thousand cyclists).

[147]    *Ward*, 491 U.S. at 802.

desirable, but not that they are insufficient for conducting large group bicycle rides or communicating the messages group rides supposedly express. Moreover, the regulations provide that in the event a parade permit application is denied for any reason other than that the applicant provided incomplete information, proposed unlawful conduct, or made material representations on the application form, the NYPD is required to employ reasonable efforts to offer the applicant a suitable alternative location, date, or time for the proposed parade or procession.[148] Accordingly, the Parade Regulations sufficiently provide cyclists with ample means to express themselves through group bicycle rides.

### D.   *Prior Restraint and Vagueness*

Regulations that require permits for expressive activity in traditional public fora are prior restraints on speech and therefore are unconstitutional if they vest in a public official unbridled discretion to deny permits. The Supreme Court held in *Forsyth County v. Nationalist Movement*[149] that a regulation "that allows arbitrary application is inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view."[150] "To curtail that risk, a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license must contain 'narrow, objective, and definite standards to guide the licensing authority.'"[151] A permit scheme is unconstitutional if it "involves appraisal of

---

[148]   38 R.C.N.Y. § 19-04(b).

[149]   505 U.S. 123 (1992).

[150]   *Id.* at 130 (quoting *Heffron*, 452 U.S. at 649); *accord Transp. Alternatives, Inc. v. City of New York*, 340 F.3d 72, 77-78 (2d Cir. 2003).

[151]   *Forsyth*, 505 U.S. at 131 (quoting *Shuttlesworth*, 394 U.S. at 150-51).

facts, the exercise of judgment, and the formation of an opinion by the licensing authority."[152]


1.        *"Events of Extraordinary Public Interest"*

Plaintiffs challenge the "events of extraordinary public interest" exception to the Parade Regulations' Fifth Avenue restriction. An event of extraordinary public interest is defined in

---

[152]

*Id.*

The Second Circuit passed on the vagueness of an earlier version of the Parade Regulations in *MacDonald v. Safir*, 206 F.3d 183 (2d Cir. 2000). The court there held that the language of N.Y.C. Ad. C. § 10-110(a)(1), allowing the Police Commissioner to deny a permit if he believes a parade "will be disorderly in character or tend to disturb the public peace," and § 10-110(a)(4), allowing the Commissioner to grant a special permit for "occasions of extraordinary public interest, not annual or customary," were not "sufficiently precise to survive the facial challenge," standing alone. *Id.* at 192 (quoting *Turley v. Police Dep't of New York*, 167 F.3d 757, 762 (2d Cir. 1999). The court held, however, that the Parade Regulations could be saved if the City could show that the Police Commissioner's discretion was "constrained by administrative construction or by well-established practice." *Id.*

The City subsequently enacted 39 R.C.N.Y. § 19 *et. seq.* Section 19-01(a) clarifies that "disorderly in character" applies to parades that violate certain sections of the Penal Law and that "would otherwise present an unreasonable danger to the health or safety of the applicant, parade participants or other members of the public, or cause damage to public or private property." Plaintiffs do not here challenge this definition. Nevertheless, the Supreme Court in *Thomas v. Chicago Park District*, 534 U.S. 316 (2002), held that an almost identical standard passed constitutional muster. *See id.* at 324. The Court held also that a permitting scheme's constitutionality would be reinforced if it required the issuing official to specify the reason for which a permit could be denied, required explanations for denial, and placed time limits on the processing of permit applications. *See id.* Section 19-04 satisfies all of these criteria.

Section 19-01(b) defines an occasion of extraordinary public interest more narrowly so as to constrain the Police Commissioner's discretion in granting special permits. Plaintiffs do challenge this language. Their argument is addressed below in the text.

Notably, the New York courts have rejected attacks on Section 10-110 as vague in light of Supreme Court's *Thomas* decision and the enactment of 38 R.C.N.Y. § 19 *et seq. See People v. James*, 7 Misc. 3d 363, 371-72, 793 N.Y.S.2d 871, 877-78 (N.Y. Crim. Ct. N.Y. Co. 2005); *see also People v. Cohen*, 6 Misc. 3d 1019(A), 800 N.Y.S.2d 352, (N.Y. Crim. Ct. N.Y. Co. 2005) (noting that § 10-110 upheld as constitutional in *James*).

46

Section 19-01(b) to include "celebrations organized by the City honoring the armed forces; sports achievements or championships; world leaders and extraordinary achievements of historic significance."[153]

Plaintiffs do not challenge the extraordinary event exception on its face. Rather, they claim that the exception has been applied to allow events that do not fit within the language of Section 19-01(b) to take place on a Fifth Avenue, thus rendering the exception meaningless and susceptible to arbitrary application.

The only evidence in the record concerning the City's issuance of special permits under the extraordinary event exception is the declaration of Lieutenant Centamore, the supervisor of the division of the NYPD that issues parade permits. According to Lieutenant Centamore, special permits for use of Fifth Avenue have been granted for a ticker tape parade to celebrate a World Series victory by the New York Yankees and the arrivals in New York of Nelson Mandela and the Pope. Lieutenant Centamore stated also that the mayor approved a special permit for use of Fifth Avenue on June 19, 2004 in connection with a relay in which the Olympic torch was carried through 34 cities across five continents, including New York.[154]

Plaintiffs do not contend that the ticker tape parade or the events honoring the Pope and Nelson Mandela fall outside Section 19-01(b). They do claim, however, that "[t]he mayoral permission given to the [Olympic relay] cannot be squared with any reasonable interpretation of

---

[153]

38 R.C.N.Y. § 19-01(b).

[154]

Centamore Decl. ¶ 18.

[Section 19-01(b)]."[155] The Court disagrees. It would not be unreasonable to consider a relay honoring one of the most revered athletic traditions in the world a "celebration[] . . . honoring sports achievements."

Plaintiffs contend also that the City has granted special permits for a peace march and a demonstration in connection with the shooting of an individual named Sean Bell. But the record contains no evidence concerning these events. The Court therefore has no basis from which to conclude that these events occurred or, if they did, that they either were granted special permits or took place on Fifth Avenue without permits and without police interference. Accordingly, the Court disregards the claims about these events.[156]

### 2. "Great Congestion or Traffic"

Plaintiffs next challenge Section 10-110(a)(2), which requires the Police Commissioner to deny a parade permit "for the use of any street . . . which is ordinarily subject to great congestion or traffic and is chiefly of a business or mercantile character," from 9:00 a.m. to 6:30 p.m., except on holidays and Sundays when "places of business along the route proposed are closed."[157] They claim that when the provision is given its plain meaning, "virtually every Avenue

---

[155]

Pl. Mem. 50.

[156]

*See United States v. Stein*, 440 F. Supp. 2d 315, 327 (S.D.N.Y. 2006) ("A party seeking to raise a factual issue to be determined at a hearing must submit admissible evidence which, if credited, would make out a *prima facie* case on the issue. This in turn requires that the issue ordinarily be raised by an affidavit of a person with personal knowledge of the facts." (quoting *United States v. Ahmad*, 992 F. Supp. 682, 685 (S.D.N.Y. 1998))).

[157]

N.Y.C. Ad. C. § 10-110(a)(2).

48

and many other roadways in New York City would qualify," and the City thus would have "the practical ability to force 50-person group bicycle rides held on Saturdays (which constitute up to 50% of many club-sponsored group bicycle rides) off the roads completely."[158] If Section 10-110(a)(2) were not given its plain meaning, plaintiffs claim, the NYPD would be left with unfettered discretion to deny permits.

As a preliminary matter, the Parade Regulations, contrary to plaintiffs' assertions, do not permit the City effectively to banish group bicycle rides of 50 or more from the streets. The regulations make clear that when a permit application is disapproved because the proposed event will interfere with traffic in the area, the NYPD "shall employ reasonable efforts to offer the applicant a suitable alternative location, date and/or time for the parade."[159] Furthermore, the evidence indicates that the City regularly grants parade permits for events on Saturdays[160] and that it previously has granted permits for a number of large-scale bicycle rides.[161] Indeed, Lieutenant Centamore stated that he knows of no occasion where a permit for a large group bicycle ride was disapproved.[162]

In addition, Critical Mass rides in New York occur at 7:00 p.m.,[163] about half of

---

[158]     Pl. Mem. 50.

[159]     38 R.C.N.Y. § 19-04(d).

[160]     *See* Centamore Decl. ¶ 19.

[161]     *Id.* ¶¶ 20-21.

[162]     *Id.* ¶ 21.

[163]     Son Decl. ¶ 12.

5BBC's rides occur on Sunday,[164] and Professor Jackson's ride is held at night.[165] The "great congestion or traffic" standard, which applies only to rides scheduled Monday through Saturday between 9:00 a.m. and 6:30 p.m., therefore does not apply to these rides.

        This ultimately may be beside the point, however, as the Court is not persuaded that the language of Section 10-110(a)(2) is unconstitutionally vague. It directs the Police Commissioner to consider "objective factors" such as the location of the proposed procession and the time it is occurring.[166] Some discretion is granted to the Commissioner in judging whether an area "ordinarily" is subject to "great" congestion, or is "chiefly" of a business character. But as the Supreme Court has held, "[c]ondemned to the use of words, we can never expect mathematical certainty from our language."[167] The Constitution is not so demanding as to require the City to define "great congestion," for example, by reference to the average number of cars and people that pass through an area each day or to define "chiefly of a business character" by reference to the number of businesses in the neighborhood.

        Furthermore, the language of Section 10-110(a)(2) does not "allow the [Police

---

[164]

Lieberman Decl. ¶ 7.

[165]

Jackson Decl. ¶ 4

[166]

*See Douglas v. Brownell*, 88 F.3d 1511, 1522 (8th Cir. 1996) (parade ordinance requiring Chief of Police to grant parade permit application "unless the time, route, or size of the parade will disrupt the use of a street 'ordinarily subject to significant congestion or traffic'" not unconstitutionally vague because it was "based on objective factors: the time, route, and size of the parade" it did "not allow the Chief of Police to consider the content or purpose of the parade" and there was "no evidence that the City ha[d] applied the parade permit ordinance so as to restrict freedom of speech or assembly rights.")

[167]

*Grayned*, 408 U.S. at 110 (statute prohibiting the making of "noise or diversion which disturbs or tends to disturb the peace or good order of [a] school session or class thereof" not unconstitutionally vague).

50

Commissioner] to consider the content or purpose of the parade."[168] Nor is there "evidence that the City has applied the parade permit ordinance so as to restrict freedom of speech or assembly rights," or discriminate based on an applicant's identity or intended message.[169]

### 3.   "Recognizable Group"

Finally, plaintiffs challenge the "recognizable group" standard that triggers the Parade Regulations' permit requirement. Their argument, however is confusing. Citing *Forsyth*, plaintiffs contend that the "recognizable group" standard requires police, in assessing whether or not to arrest or ticket cyclists traveling in a group, "to appraise facts (by engaging in an on-the-spot head count of group ride members), exercise judgment (by deciding which riders are actually part of the group ride), and form an opinion (as to which riders should be arrested and/or ticketed for parading without a permit)."[170] They do not argue that the "recognizable group" standard grants the Police Commissioner unfettered discretion to deny a parade permit.

The *Forsyth* prior restraint analysis, however, is appropriate for assessing whether a licensing scheme grants an *issuing* official unbridled discretion to deny a license, not whether an *enforcing* officer is given inadequate guidance as to what constitutes an offense.[171] The latter

---

[168]

*Douglas*, 88 F.3d at 1522.

[169]

*Id.*

[170]

Pl. Mem. 46 (citing *Forsyth*, 505 U.S. at 131).

[171]

*See Ward*, 491 U.S. at 793-94 & n.5 (emphasizing that prior restraint doctrine applies where official charged with granting licenses has too much discretion, and doubting whether it is appropriate for situations where an enforcing official arguably has too much power to restrict speech).

question is analyzed under the Due Process Clause vagueness test, which is similar but nevertheless a distinct inquiry from the First Amendment prior restraint test. A law is impermissibly vague under the Due Process Clause if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. . . . [or] authorizes or even encourages arbitrary and discriminatory enforcement."[172]

The gist of plaintiffs' argument is not that the Parade Regulations fail to provide ample notice to the citizenry about what conduct is prohibited. Rather, it is that the police are invited to apply the regulations in a discriminatory fashion. The Court is not persuaded, however, that the "recognizable group" standard is so vague as to invite arbitrary enforcement.

First, when Section 19-02(a) is considered in its entirety,[173] it is clear that police are afforded less discretion in enforcing the Parade Regulations than plaintiffs contend. The section specifies that only groups of 50 or more bicycles "proceeding together" are required to obtain a permit. The police therefore are guided to enforce the Parade Regulations only against groups that exceed a specific size and where the individuals in the group appear to be traveling, for example, along the same route at approximately the same pace.[174]

---

[172]

*Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citing *Chicago v. Morales*, 527 U.S. 41, 56-57, (1999)).

[173]

*See, e.g.*, *Schenck v. Pro-Choice Network Of Western New York*, 519 U.S. 357, 383 (1997) (injunction not unconstitutionally vague when "read as a whole") (citing *Grayned*, 408 U.S. at 110 ("[W]e think it is clear what the ordinance as a whole prohibits.")).

[174]

For this reason, plaintiffs' reliance on the fact that some cyclists have been arrested simply for being on bicycles while in the vicinity of a group bicycle ride is unavailing. These arrests occurred prior to the amendment of § 19-02. The old definition of "parade or procession" did not include the 50-person threshold or the "recognizable group" or "proceeding together" standards, all of which serve to constrain police discretion and make the regulations more precise.

Second, while the "recognizable group" standard is "undoubtedly flexible, and the officials implementing [it] will exercise . . . discretion, perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity."[175] As noted, the constitution does not require "mathematical certainty" from statutory language.[176] The "recognizable group" standard perhaps could have been made more precise by emphasizing that police are to consider, for example, whether cyclists are wearing similar clothing or identifiable marks or chanting the same songs and slogans.[177] But there is little reason to doubt that reasonable police officers would consider this and similar factors in deciding if a group of cyclists were traveling as a group and not merely as a collection of individuals riding in proximity to one another. Nor is it clear that any more precise language could have been used to narrow the applicability of the Parade Regulations.

## Conclusion

The Court is sympathetic to plaintiffs' concerns. It recognizes that tensions long have been high between Critical Mass participants and the NYPD[178] and that the Parade Regulations in certain circumstances impose inconveniences that limit plaintiffs' ability to bicycle through the streets of New York City with unfettered freedom. But the Constitution requires a balance to be struck between plaintiffs' interests in riding when and where they want and the City's interest in

---

[175]
    *Ward*, 491 U.S. at 794.

[176]
    *Grayned*, 408 U.S. at 110.

[177]
    *See* Nelson Decl. ¶ 14 (explaining that Critical Mass riders chant slogans and sing songs about bicycling).

[178]
    *See, e.g.*, Emily Vasquez, *Bicyclists and Others Protest A Plan for New Parade Rules*, New York Times, Nov. 28, 2006.

53

ensuring that all people and vehicles use its streets effectively and safely without overburdening

scarce law enforcement resources. The Court is not persuaded that plaintiffs are likely to prevail on

their constitutional arguments. Accordingly, their motion for a preliminary injunction [docket item

3] is denied.

       The foregoing constitute the Court's findings of fact and conclusions of law.

       SO ORDERED.

Dated:  April 17, 2007

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)