UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
FIVE BOROUGH BICYCLE CLUB, et al.,

                          Plaintiffs,


             -against-                                          07 Civ. 2448 (LAK)


THE CITY OF NEW YORK, et al.,

                          Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**OPINION**


Appearances:

                    Jeremy Feigelson
                    Erik Bierbauer
                    Shanya Dingle
                    Steve Vaccaro
                    Emily J. Mathieu
                    Brendan W. Caldon
                    DEBEVOISE & PLIMPTON LLP
                    *Attorneys for Plaintiffs*


                    Robin Binder
                    Mark. W. Muschenheim
                    Nicholas R. Ciappetta
                    Teresita V. Magsino
                    Assistant Corporation Counsel
                    MICHAEL A. CARDOZO
                    CORPORATION COUNSEL OF THE CITY OF NEW YORK
                    *Attorneys for Defendants*

**Table of Contents**

I.   FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
  A.   PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
  B.   THE PARADE REGULATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
  C.   GROUP BICYCLE RIDES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      1.   REASONS FOR RIDING IN GROUPS . . . . . . . . . . . . . . . . . . . . . . . 5
      2.   CRITICAL MASS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
          A.   MANHATTAN CRITICAL MASS . . . . . . . . . . . . . . . . . . . 7
          B.   BROOKLYN CRITICAL MASS . . . . . . . . . . . . . . . . . . . . . 12
      3.   THE MONTAUK CENTURY RIDE . . . . . . . . . . . . . . . . . . . . . . . 15
      4.   POTENTIAL HAZARDS OF GROUP BICYCLING . . . . . . . . . . . . . . 16
  D.   PLAINTIFFS CLAIMING SELECTIVE ENFORCEMENT AND RETALIATION . . . . . . 22
  E.   PRIOR PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

II.   DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
  A.   SELECTIVE ENFORCEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
      1.   INDIVIDUAL SELECTIVE ENFORCEMENT CLAIMS . . . . . . . . . . . . . . 25
          A.   TREATMENT DIFFERENT FROM THOSE SIMILARLY SITUATED . . . 26
          B.   IMPROPER MOTIVE . . . . . . . . . . . . . . . . . . . . . . . . . . 27
      2.   SELECTIVE ENFORCEMENT AGAINST MCM AND/OR ITS PARTICIPANTS
           GENERALLY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
          A.   TREATMENT DIFFERENT FROM OTHERS SIMILARLY SITUATED . . 28
              (1)   SIMILARLY SITUATED . . . . . . . . . . . . . . . . . . . . 28
              (2)   DIFFERENT TREATMENT . . . . . . . . . . . . . . . . . . . . 32
          B.   IMPROPER MOTIVE . . . . . . . . . . . . . . . . . . . . . . . . . . 38
  B.   THE FIRST AMENDMENT RETALIATION CLAIM . . . . . . . . . . . . . . . . . 43
  C.   VEHICLE AND TRAFFIC LAW SECTION 1231 . . . . . . . . . . . . . . . . . . . 44
  D.   THE PARADE REGULATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
      1.   RIGHT TO TRAVEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
      2.   FREEDOM OF ASSOCIATION . . . . . . . . . . . . . . . . . . . . . . . . . 47
      3.   FREE SPEECH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
          A.   FIFTY-PERSON THRESHOLD . . . . . . . . . . . . . . . . . . . . 50
          B.   CHIEF OFFICER REQUIREMENT . . . . . . . . . . . . . . . . . . . 52

III.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Lewis A. Kaplan, *District Judge.*

As the Court previously observed, this case presents a conflict between bicyclists who wish to ride through New York City streets in large groups, free of any requirements of advance notice to and permits from the New York City Police Department (the "NYPD"), and the interest of the City in enforcing a permitting scheme that, it says, is necessary to facilitate traffic flow and protect the interests of bicyclists and motorists alike.

Plaintiffs contend that the permit requirement infringes upon their constitutional rights to travel, expressive association, and free speech. Several individual plaintiffs assert also that the NYPD has retaliated and selectively enforced traffic regulations against cyclists who have participated in so-called Critical Mass rides in Manhattan. They claim as well that defendants have denied them rights claimed under Section 1231 of the New York State Vehicle and Traffic Law ("VTL").[1] Plaintiffs seek a permanent injunction prohibiting enforcement of the permitting scheme and enjoining selective and retaliatory enforcement in violation of their alleged rights under the First Amendment and under VTL Section 1231.[2]

This is the Court's decision after trial. But the Court is not writing on a clean slate. It previously denied a preliminary injunction barring enforcement of the permitting scheme. That

---

[1]

Section 1231 provides:

"Every person riding a bicycle or skating or gliding on in-line skates upon a roadway shall be granted all of the rights and shall be subject to all the duties applicable to the driver of a vehicle by this title, except as to special regulations in this article and except as to those provisions of this title which by their nature can have no application." N.Y. Veh. & Traf. L. § 1231 (McKinney 1996).

[2]

Amended Complaint ¶ 14 ("Am. Cpt.").

decision was affirmed on appeal.[3]  In consequence, the legal principles that determine the outcome of plaintiffs' challenge to the City's permitting scheme have been settled.  What remains for determination therefore is (1) the selective enforcement, retaliation and Section 1231 claims, and the question (2) whether the evidence at trial warrants a different result with respect to the permitting scheme.

## I.    Facts

### A.    Parties

Plaintiffs Sharon Blythe, Josh Gosciak, Madeline Nelson, Elizabeth Shura, and Luke Son are residents of New York City who participate in group bicycle rides and who have taken part in the group ride known as Manhattan Critical Mass ("MCM").[4]  All save Mr. Gosciak at one point or another have been arrested or issued a summons issued by the NYPD during a MCM ride.[5]

Plaintiff Kenneth T. Jackson is a distinguished New York City historian and Columbia University professor who organizes and conducts an annual nighttime bike tour of New York City for approximately 250 of his students and others.  Professor Jackson never has participated in a Critical Mass ride.[6]

---

[3]

*Five Borough Bicycle Club v. City of New York,* 483 F. Supp.2d 351 (S.D.N.Y. 2007) (hereinafter *"5BBC I"), aff'd,* 308 Fed. Appx. 511 (2d Cir. 2009).

[4]

Joint Pretrial Order § III ¶¶ 4-8, subsequently cited as "PTO" followed by the relevant paragraph number(s) of § III.

[5]

*Id.*

[6]

*Id*. ¶ 3.

Plaintiff Five Boro Bicycle Club ("5BBC") is a not-for-profit bicycle club that promotes group bicycling in New York City by organizing group rides.  It advocates for cyclists' "right to the road" in newsletters, public forums and in testimony at public hearings.[7]

5BBC organizes about 250 group rides, or "day trips," each year.[8]  The rides are intended to promote "a greater understanding of the world and its people through out-of-doors, educational and recreational travel" as well as to "develop good leadership skills" and "provide an educational opportunity for cyclists to become competent and self reliant."[9]  They take place every weekend of the year, as well as on holidays.  Weekend and holiday rides generally begin before noon, although some occur during the evening.  They typically range from 25 to 80 miles in length and take place at least partially within New York City.  Since January 2004, approximately eleven

---

[7]

Direct testimony of Edward Ravin (PX 279) at 3.

As this case was tried to the Court without a jury, the direct testimony of the witnesses was submitted in the form of written statements and the witnesses then were tendered for cross-examination and redirect, as needed, in open court.  Written direct testimony hereafter will be cited to the exhibit number followed a parenthetical reference to the witness's surname, as PX 279 (Ravin) at __.

Much of the direct testimony submitted in writing contains the witnesses' opinions about the motivations of people other than the witness, legal arguments and conclusions, hearsay, and other inadmissible evidence that the Court would not have permitted a jury to hear.  As this was a bench trial, it was more efficient to receive these materials into evidence on a limited basis.  The Court has not received or considered the inadmissible portions of the statements as evidence.

[8]

*Id.* At 4; PTO ¶ 2.

[9]

DeFreitas Decl. Ex. A (5BBC by-laws).

Mr. DeFreitas' declaration was submitted to the Court as part of plaintiffs' motion for a preliminary injunction.  Pursuant to FED. R. CIV. P. 65(a)(2), the evidence received on that motion is part of the trial record.  *See, e.g.*, *Project Strategies Corp. v. National Communs. Corp.*, 948 F. Supp. 218, 221 (E.D.N.Y. 1996).

of these rides have included 50 or more participants.[10]

Defendants are the City of New York and several high ranking members of the NYPD, including Commissioner Raymond Kelly.

B.      *The Parade Regulations*

The City regulates parades, processions, and other mass gatherings that take place on public roadways through Section 10-110 of the New York City Administrative Code and Sections 19-01 through 19-04 of Title 38 of the Rules of the City of New York (collectively, the "Parade Regulations"). This case concerns a 2007 amendment to the Parade Regulations that made them applicable specifically to group bicycle rides of 50 or more participants.

*5BBC I* described the Parade Regulations and the process that led to the amendment that brought them to their current form.[11]   There is no need to repeat that discussion, which is incorporated herein by reference.

C.      *Group Bicycle Rides*

By some estimates, over 100,000 individuals ride bicycles through the streets of New York City every day.[12]   There are dozens of clubs and associations through which cyclists can participate in the approximately 1,000 group bicycle rides that take place each year and that range

---

[10]      PTO ¶ 2.  Note that in another section of the PTO, it is asserted that there have been twelve 5BBC rides with 50 or more participants since 2004.  PTO ¶¶ 49-50.

[11]      *5BBC I,* 483 F. Supp.2d at 357-60.

[12]      PX 279 (Ravin) at 1.

in size from just a few to more than a thousand cyclists.[13]

### 1.   *Reasons for Riding in Groups*

Cyclists organize and participate in group rides for a variety of reasons.  These include meeting and conversing with other cyclists, taking advantage of what some perceive as the enhanced safety of riding in numbers, and expressing their views regarding the benefits of bicycling over driving and cyclists' entitlement to the same respect afforded motor vehicles.[14]

Some group rides are meant also to be educational.  For example, Professor Jackson has been conducting his nighttime tour of Manhattan since 1975 with the goal of teaching participants about New York City culture and history.[15]  Similarly, several 5BBC rides have an educational component, such as 5BBC ride leader Josh Gosciak's tour through a historic African-American community on Staten Island that was free during the 19th century.[16]

### 2.   *Critical Mass*

Among the group bicycle rides in New York City are two referred to as Critical Mass rides – one in Manhattan and the other in Brooklyn.  Both have occurred regularly for some years.

---

[13]
> PX 279 (Ravin) at 9-10; PX 277 (Gosciak) at 5-6; DX NNN (Son Decl.) ¶¶ 15, 19; DX LL (Lieberman Decl.) ¶ 8.

[14]
> PX 279 (Ravin) at 2; PX 277 (Gosciak) at 4; PX 280 (Nelson) at 3; PX 284 (Son) at 2; PX 285 (Shura) at 2; PX 287 (Blythe) at 2.

[15]
> PX 286  (Jackson) at 1.

[16]
> PX 277 (Gosciak) at 5-6.

6

The Manhattan ride generally occurs on the fourth Friday of each month, departing from Union Square Park at 7:30 p.m.[17]  The Brooklyn ride generally occurs on the second Friday, departing from Grand Army Plaza at about the same time.  As explained by plaintiff Elizabeth Shura, who has participated in both Manhattan and Brooklyn Critical Mass rides, Critical Mass is "a group where only the starting point and a regular time to start are established in advance" and which then "proceeds by group decision-making."[18]  Aside from these most basic elements, however, it is difficult to generalize about the Critical Mass rides for at least two distinct reasons.

First, the City concedes for present purposes plaintiffs' claim that Critical Mass has no organization or leaders.[19]  One therefore cannot point to any authoritative statement of principles, policies or objectives of Critical Mass.  In other words, it generally is impossible to say, at least categorically, that Critical Mass, or Critical Mass rides, have any particular purpose, objective or destination apart from the  purposes, objectives and destinations of the individual participants and whatever may be inferred from their common conduct.  For example, while some plaintiffs[20] and probably some others participate in Critical Mass rides in part to advocate for bicycling as a safe and clean alternative to driving cars or to express their belief in cyclists' equal right to the road, plaintiffs

---

[17]
>    PTO ¶ 1.

[18]
>    Shura Dep. 50:10-12.

[19]
>    *See*, *e.g.*, Trial Transcript ("TT") 210:1-11 (as to Manhattan); PTO ¶ 29 (as to Brooklyn).

[20]
>    *See* PX 280 (Nelson) at 4, 6; PX 284 (Son) at 2; PX 285 (Shura) at 2.

have not demonstrated that all or even most participants are so motivated.[21]

Second, there has been a world of difference between the Manhattan and Brooklyn Critical Mass rides in terms of their size, the conduct of their participants and the participants' interaction with the NYPD.

### a.    *Manhattan Critical Mass*

Critical Mass bicycle rides have taken place in Manhattan at least since the mid-1990's.[22]  Prior to 2004, they generally were small affairs and drew correspondingly small police attention.  Over time, Manhattan Critical Mass ("MCM") grew in size while the police presence remained essentially constant.  As late as 2003, the rides regularly drew a contingent of between two and six officers, all from the First Precinct's Scooter Task Force.[23]

By all accounts, relations between MCM participants and police assigned to the rides were largely free of conflict until the summer of 2004.  Prior to that time, NYPD officers engaged in no significant enforcement action against MCM participants and, as one rider related, officers assigned to the small scooter force "generally would protect the rear of the ride against oncoming traffic" and sometimes blocked intersections by a practice called "corking" so that riders could stay

---

[21]

This is a modification to some degree, based on additional evidence, of my provisional conclusion on the preliminary injunction motion that Critical Mass rides have a political purpose of "advocat[ing] for bicycling as a safe and clean alternative to driving cars." *5BBC I,* 483 F. Supp.2d at 355.

[22]

*See Bray v. City of New York*, No. 04 Civ. 8255 (WHP), 2005 WL 2429504 at *1 (S.D.N.Y. Sept. 30, 2005).

[23]

DX DDDD (Wagner) at 1; Smolka Dep.149:8-12.  The Scooter Task Force is mobile unit assigned to police parades and demonstrations within the NYPD's Patrol Borough Manhattan South ("PBMS").  DX DDDD (Wagner) at 1.

8

together.[24]  This account of the general state of things is corroborated by, among others, a police officer who covered the ride for the task force from 2003 to 2008.[25]  The situation changed dramatically in the summer of 2004.

Thousands participated in the July 2004 MCM ride.  Thousands deviated from the group's "normal pattern of staying on local side streets and avenues and instead" rode – illegally[26] – onto the West Side Highway, through the Battery Park Underpass, and onto the Franklin Delano Roosevelt ("FDR") Drive.[27]  Once on the FDR, cyclists blocked entrances and exits and brought traffic to a standstill for over 15 minutes.[28]  After exiting the FDR, MCM participants then continued to block traffic by performing a "bike lift," which consisted of riders dismounting and holding their bicycles above their heads.[29]

After the July 2004 ride, the NYPD changed its approach to MCM rides.  It shifted

---

[24]

PX 279 (Ravin) at 11.

"Corking," engaged in by some Critical Mass participants without police approval or participation, consists of cyclists riding through traffic lights, taking up entire roadways, or dismounting from their bicycles in order to block intersections so as to prevent cars from splintering the group or otherwise becoming entangled in the midst.  *See Bray v. City of New York*, 356 F. Supp.2d 277, 279 (S.D.N.Y. 2004) (corking by Critical Mass participants).

[25]

DX DDDD (Wagner) at 1-2 (Officer Wagner testifying that the scooter force did not take enforcement action against the participants and that officers sometimes relieved riders of their "corking" positions and blocked intersections for them).

[26]

The parties agree that riding bicycles is prohibited on the FDR Drive and West Side Highway.  *See also* 34 Rules of the City of New York ("RCNY") §§ 4-12(o), 4-07(i).

[27]

Scagnelli Dep. 121:5-11, 212:22-24; DX (Wagner) DDDD at 2; TT 410:5-11.

[28]

DX DDDD (Wagner) at 3; Scagnelli Dep. 213:22-214:6.

[29]

DX DDDD (Wagner) at 3.  *See also* PX 287 (Blythe) at 3 (describing bike lifts).

from escorting the rides to enforcing the traffic regulations against MCM participants who violated them by, among other things, making arrests.[30]

The first application of the department's new approach came on Friday, August 27, on the eve of the Republican National Convention ("RNC"). As that evening's MCM ride began forming at Union Square, NYPD officers handed out a "Notice to Bicyclists" advising, among other things, that bicyclists "could not ride on the sidewalk or bridges, tunnels, drives or expressways, and that bicyclists must ride in a usable bike lane if one is provided."[31]

Thousands of riders took to the streets that evening, and the result fairly is described as having been chaotic and dangerous. The MCM ride occurred over a vast distance as hundreds of other demonstrations were taking place in the City.[32] At various points, MCM participants engaged *en masse* in traffic violations, including running red lights and taking up all available traffic lanes on the streets they traveled.[33] Some engaged in violence toward motorists.[34] The ride altered traffic patterns in midtown Manhattan.[35] One high ranking NYPD officer, whose testimony I credit, described the effect of the ride as follows:

---

[30]
> DX CCCC (Graham) at 3; DX DDDD (Wagner) at 3; TT 248:22-25, 417:3-18, 419:25-420:3; *see* DX FFFF (DeQuatro) at 4.

[31]
> DX CCCC (Graham) at 3.

[32]
> Scagnelli Dep. 224:7-17.

[33]
> *See* Turco Dep. 262:13-18; TT 145:15-21.

[34]
> *E.g.*, Winski Dep. 33:3-35:10.

[35]
> TT 145:12-24.

> "I saw motorists screaming, throwing stuff, revving up their engines, pretending – moving forward for like five feet like they were going to kill people.  It was like, and not just one, like lots of them.  It was scary. . . I thought we were going to have mass murder."[36]

The same officer saw MCM riders, on "a number of occasions the night of the RNC," block fire trucks, ambulances, and marked police vehicles, including his own.[37]  Ultimately, the NYPD on that occasion used police vans to enclose between 250 and 300 cyclists within a city block and then arrested them on charges that included parading without a permit and disorderly conduct.[38]

*Subsequent Developments*

The remainder of 2004 saw MCM rides with large turnouts and large numbers of arrests.[39]  Then, in 2006, the NYPD changed tack again, then shifting its focus from arresting MCM participants for parading without a permit and disorderly conduct to issuing summonses for

---

[36]

Scagnelli Dep. 214:25-215:8.

The dramatic and potentially violent scene mirrored what Scagnelli had witnessed during the July 2004 MCM ride.  Scagnelli described that scene as follows:

"You got bicycles riding all over the place. You got cars all over the place.  You have people sitting in cars stuck.  I was shocked and still am to this day that there weren't - - well, there actually were road rage incidents and I'm shocked that frankly some crazy driver didn't just drive through the intersection and kill 20 bicyclists."  *Id.* at 214:12-19.

[37]

*Id.* at 273:16-20.

[38]

TT 413:18- 414:5.

[39]

From September to November 2004, MCM rides averaged 1,733 participants and 533 police officers.  During that period, officers assigned to MCM made 58 arrests and issued 7 summonses.  PTO ¶ 15.

violations of traffic laws  such as riding through red lights or failing to use available bicycle lanes.[40] The parties agree that the NYPD's shift from arrests to summonses occurred at least in part because of pending litigation over the constitutionality of the City's Parade Regulations.[41]

The amendment to the Parade Regulations required a permit for any procession or race consisting of, among other things, "a recognizable group of 50 or more" and became effective in February 2007.[42]  At some later point, at least some MCM riders made a tactical change of their own.  As before, riders gathered initially at Union Square.  But instead of exiting the area as one group, they began leaving in smaller groups in an apparent attempt to avoid enforcement of the Parade Regulations.  Some or all of the riders, however, then sometimes joined together at another location or locations to create a larger group or groups.[43]

The NYPD responded by implementing a "scout system" whereby officers were deployed in specific parts of the PBMS to watch for the formation of large groups of cyclists.[44] According to Lieutenant Dennis DeQuatro, who developed it, the "purpose of the scout system was not to prevent the formation of such groups, but merely to monitor the groups for violations of the

---

[40]

DX FFFF (DeQuatro) at 4; TT 420:4-7.

A comparison of arrests versus summonses at MCM rides during the relevant periods reflects the change in the department's enforcement approach.  *See* PTO ¶¶ 15-19.

[41]

Pl. Post Tr. Mem. at 6-7; TT 388:9-14; DX FFFF (DeQuatro) at 4.

[42]

*See 5BBC I*, 483 F. Supp. 2d at 357-60.

[43]

*See* DX FFFF (DeQuatro) at  4-5; *see also* TT 394:7-16; Turco Dep. 160:3-161:7; Anger Dep. 25:17-19.

[44]

DX FFFF (DeQuatro) at 4-5; TT 293:20-294:5.

12

traffic laws and to see if the group was reforming into a larger group."[45]

Beginning in 2005, average MCM participation and average police presence at MCM rides both began to decrease[46]  Indeed, from January through August 2008, MCM rides attracted an average of only 31 participants, down from an average of 200 in 2005.[47]  Nevertheless, the decline in rider participation and police activity have not eliminated frequent violations of law at MCM rides.  Indeed, there were numerous violations after 2004 and as recently as the April 2009 ride.[48] It is important to note also that, while MCM rides have grown smaller since their apparent peak in 2004, the most recent ride as to which there is evidence in the record, still drew between seventy and one hundred participants.[49]

### b.   Brooklyn Critical Mass

The history of Brooklyn Critical Mass ("BCM") rides contrasts sharply with that of

---

[45]

DX FFFF (DeQuatro) at 4-5.

[46]

In 2005, the average MCM ridership was 200 and the average police presence exceeded 158 officers.  PTO ¶ 16.  In 2006, average MCM participation was 170 and the average police presence exceeded 116 officers.  PTO ¶ 17.  By 2007, average ridership was 89 and the average police presence was 110.  PTO ¶ 18.

[47]

PTO Apps. B, E.

[48]

*See*, *e.g.*, DX CCCC (Graham) at 4 (describing June 2005 MCM ride during which 150 to 200 bicyclists took up all available lanes of traffic while riding through Manhattan and then continued illegally onto the lower roadway of the Queensboro Bridge); DX FFFF (DeQuatro) at 1-2 (describing an MCM rider deliberately riding at, and injuring, an officer, and another ride in March 2005 during which bicyclists attempted to escape police by riding on the sidewalk and abandoning their bicycles by chaining them to scaffolding and light poles); Def. Post Tr. Mem 17 (collecting evidence on violations observed during the April 2009 ride).

[49]

PX 277 (Gosciak) at 8.

MCM rides.

First, until the sharp drop in MCM participation, participation in BCM was significantly lower and more consistent than in the Manhattan rides, a fact plaintiffs' witnesses acknowledged.[50]  Indeed, Sergeant Mark Layne, who has policed over 30 BCM rides over a five year period, testified that the majority of BCM rides he had observed had fewer than 50 riders and that he did not recall having seen one that exceeded 100 participants.[51]

Second, BCM rides have been conducted with "minimal public safety or traffic congestion concerns."[52]  The majority of them traveled through residential neighborhoods that were not heavily trafficked.  When they have traveled on busier roadways, such as Flatbush Avenue, participants often rode in the direction opposite and on the other side of the street from the heavier flow of traffic coming from Manhattan.[53]  Moreover, BCM participants never have engaged in conduct analogous to thousands of cyclists riding illegally onto the FDR Drive or the West Side Highway – actions that created safety hazards and effectively shut down traffic on some of the City's busiest arteries.  Not one witness testified to a single incident of violence or confrontation with motorists during a BCM ride.  But the most salient difference separating the rides, and one that perhaps flows from the preceding points, lies in the interaction between BCM participants and the

---

50

See TT 76:7-19, 47:15-48:22; DX NNN (Son Decl.) ¶¶ 15, 16.

51

DX EEEE (Layne) at 1-2 ; TT: 338:7-17.  *See also* TT 453:9-14 (plaintiffs' counsel acknowledging that "[M]any of the Brooklyn rides are under 50 [participants]" and that only three to five BCM rides per year "approach or exceed 50.").

52

DX EEEE (Layne) at 2.

53

*Id*. at 2-3.

14

police assigned to BCM.

      The interaction between BCM and the NYPD has been cooperative, calm, even cordial – descriptors that do not lend themselves to the MCM rides.[54]  There have been no summonses issued or arrests made in connection with *any* BCM ride.[55]  BCM riders sometimes have told police their ultimate destinations, if not a turn-by-turn route, in advance, and riders commonly have provided the police with a "general direction of which way the group is starting to ride."[56] Sergeant Layne knows by name BCM participants, at least one of which has ridden at the front of the group and who sometimes has told him the ride's ultimate destination, suggesting a possible leadership role at least for those rides.[57]  For their part, officers have facilitated the ride by, among other things, driving alongside the group, stopping traffic to allow the cyclists to proceed together through intersections and make turns, and providing directions.  During at least one ride, police asked where the group wanted to go, offered to help get it there, and then blocked traffic to do so.[58]

      None of this is to suggest that BCM rides have been entirely law-abiding.  Indeed,

---

[54]
    *See, e.g.*, DX KKK (McGlincy Decl.) ¶ 24 (describing, among other similar occurrences, a scene at a BCM ride in which the commanding officer of the police detail arrived before a ride, greeted the riders, and had his "cordial greeting" returned by all).

[55]
    PTO ¶ 30.

[56]
    TT 59:11-12; *see also* DX EEEE (Layne) at 2.

[57]
    TT: 336:9-337:15.

[58]
    DX KKK (McClinchy Decl.) ¶¶ 19-20; DX NNN (Son Decl.) ¶ 24; *see also* TT 83:12-86:23 (suggesting also that for at least the ride(s) where the destination was given to the police at the start of the ride, there *was* a pre-determined destination for the ride), 324:20-325:4.

15

it is clear that BCM riders sometimes have violated traffic regulations.[59]  But the record is equally clear that a vast gulf has separated the Manhattan and Brooklyn rides in terms both of the quantity and severity of law breaking and the numbers of police required for each ride.  In short, I credit Sergeant Layne's testimony that BCM is "a relatively minor event that the NYPD can adequately police with a small number of scooter mounted police officers to monitor the ride."[60]

### 3.    The Montauk Century Ride

5BBC's annual Montauk Century, which has existed since 1964, is the club's premier ride, typically attracting at least a thousand riders.  Participants choose from 65, 100 or 145 mile fixed routes.  Those choosing the 145 mile route begin at Manhattan's Penn Station and bicycle to Montauk while the rest start from destinations on Long Island.  In 2008, roughly 300 riders chose the 145 mile route.[61]

According to 5BBC president Edward Ravin, the Montauk ride differed from the rest of the club's day trips because Montauk riders did not leave together or proceed as one group. Instead, riders registered at 5 a.m. at Penn Station.  Those who selected the 145 mile route then departed without waiting for others to arrive.  According to Mr. Ravin, the result was that riders ended up in clusters of "no more than 10 or so cyclists that [were] not in visual contact with each other, may [have] be[en] divided by a mile or more, and d[id] not attempt to form into any particular

---

[59]

TT 319:20-322:8 (BCM riders on occasion have proceeded through red lights and occupied all lanes of traffic).

[60]

*Id.* at 1-2.

[61]

PX 279 at 7-8.

configuration as a group."[62]

4.      *Potential Hazards of Group Bicycling*

Plaintiffs argue that traveling in groups is safer for cyclists than traveling alone.[63]

As some groups of cyclists, depending upon their size, configuration and other factors, may be more

visible to motorists and pedestrians than individual cyclists, that may be so in some cases.  But

group bicycle rides often can endanger and inconvenience other users of public roadways.  The

evidence adduced since the Court's earlier conclusion on this issue has only strengthened

defendants' position.  The Court credits defendants' testimony that the problems and risks associated

with large group bicycle rides can be cured or greatly reduced by a permitting scheme that ensures

that the police know a group's route in advance.

Deputy Chief Thomas Graham has worked for the NYPD since 1973 and, as the

commanding officer of the NYPD's disorder control unit, has planned, supervised and reviewed the

policing of hundreds of large scale events, including demonstrations and parades.[64]  According to

Chief Graham,

> "most – if not all – groups of 50 or more proceeding on the City's streets will have
> an impact on pedestrian and/or vehicular traffic, and . . . groups of fifty persons (on
> foot or by vehicle) traveling en masse on the roadways are likely to disrupt vehicular
> and pedestrian traffic, creating safety concerns for those who find themselves in the
> vicinity of the event, as well as for the pedestrians in the event.  Participants in a
> group of fifty traveling together generally try to maintain the integrity of the group
> and frequently block intersections or disregard traffic regulations to keep the group

---

62

     *Id.* at 7-8.

63

     *See*, *e.g.*, PX (Pucher) 282 at 3; PX 279 (Ravin) at 2-3.

64

     PX CCCC (Graham) at 1.

together.  Even in situations where event participants comply with traffic laws, groups of bicyclists traveling en masse still have an impact on safety of traffic around them.  When a group of bicyclists travels together they leave little natural spaces between the bicyclists.  This impacts upon other vehicles (and non-participant bicyclists) that are sharing the roadway with the group and need to merge into the right or the left lane to make a turn.  Thus, these other vehicles will have to slow down and maneuver in such a way as to try to get behind the group of bicyclists so that they can negotiate the lanes and make turns safely.  Such maneuvering impacts on the flow of traffic and presents the potential for traffic accidents."[65]

Chief Graham's testimony was echoed by that of Lieutenant Gannon, another officer with significant experience coordinating parades in Manhattan whose testimony I also accept.[66] Lieutenant Gannon testified that "[a] group of fifty people traveling together by bicycle or vehicle is likely to create a 'moving column,' thereby blocking the roadway," and that the group will "tend to try to stay together and disregard traffic regulations in order to do so."[67]

Moreover, some members of large groups of cyclists have disregarded traffic rules by running red lights, traveling along roadways on which bicycles are prohibited, riding against the

---

[65]

    *Id.* at 4-5.

[66]

    DX AAAA (Gannon) at 2, 4.

[67]

    *Id.* at 4-5.

    Lieutenant Gannon's trial testimony regarding PX 183 (TT 352-58) illustrates the point. The exhibit consists of video of a seven lane roadway in Manhattan taken on a Sunday at approximately 1:00 p.m.  The video begins with column of cyclists proceeding in the second lane from the right side of the road.  The cyclists then swing out into the third lane of traffic to avoid a van double-parked in the second lane.  The effect of the cyclists' maneuver, together with the parked and double-parked vehicles, was to block motor vehicle traffic completely from the three right-most lanes.  The Court credits Lieutenant Gannon's testimony that the maneuver by the moving column of cyclists, which did not have any natural spaces through which other traffic could have proceeded, interfered with the flow of traffic and created an increased risk of a motor vehicle or other collision.  And this was on a lightly-trafficked Sunday at 1 p.m., suggesting that the risks involved and the potential traffic disruption caused by such a moving column would be far more significant during busier times.

18

flow of traffic, and failing to use traffic signals, thus preventing pedestrians and vehicular traffic from predicting the cyclists' movements and crossing intersections safely. The record is replete with testimony from police officers as well as ride participants themselves, including some plaintiffs, that riders in MCM group rides have engaged in all of this conduct and more, including riding *en masse* onto the FDR Drive and the West Side Highway.[68]  Moreover, MCM riders on other occasions have blocked emergency services vehicles, including ambulances and fire trucks, from proceeding through intersections.[69]  And so, while Lieutenant Gannon and others agree that groups smaller than 50 can pose significant traffic and safety issues in their own right,[70] the bottom line is that groups smaller than 50 present fewer problems. Indeed, their impact on traffic flow and safety is comparatively minor because of their relatively smaller sizes.[71]

---

[68]

Blythe Dep. 30:21-32:16 (witness has ridden through red lights during MCM rides and has seen others do so and also rode onto the FDR Drive as part of MCM ride); Shura Dep. 61:24-62:5 (describing group of cyclists taking up "all that direction of Park Avenue" upon exiting Union Square); Scagnelli Dep. 242:5-10 (observed "hundreds" of violations at an MCM ride); DX AAAA (Gannon) at 1-2 (detailing various traffic violations he has observed at multiple MCM rides); Caneco Dep. 175:17-20 (observed cyclists riding wrong way on one way streets at every MCM of ride that he witnessed); DeFreitas Dep. 153:11-154:23 (describing his discomfort with participants' conduct at MCM rides).

[69]

*See e.g.*, DX DDDD (Wagner) at 4 (witnessed "police cars with their sirens blaring unable to pass the mass of bicyclists" at an MCM ride, as well as "ambulances with their lights and sirens . . . stuck in traffic caused by bicyclists corking an intersection"); Browne Dep. 126:6-8 ("Browne Dep.") (saw intersection blocked for five minutes during a MCM ride, preventing ambulance from getting through); Scagnelli Dep. 273:11-274:2 (during the August 2004 MCM ride, witnessed MCM participants block an ambulance, fire trucks, and police vehicles, including his own); Turco Dep. 284:5-8 (observed bicycles proceeding through red light, blocking cross-town traffic, including a fire truck).

[70]

DX AAAA (Gannon) at 3-4; Turco Dep. 202:19-03:12 (observing that he has seen as few as 22 bikers take up the whole road and block traffic).

[71]

Caneco Dep. 50:22-51:12.

Furthermore, the impact of a group of 50 or more cyclists depends upon the size of the group, the streets being traveled, the number of lanes being occupied, the speed of the group, whether there is street construction nearby, the time and day of the week, and the number and size of other events taking place in the City at that time.[72]  It is possible that some groups of 50 or more will proceed safely and with no detrimental impact on traffic.[73] But context matters, and the NYPD is best able to minimize a group's impact by coordinating the group's movements with those of others on the road.[74]  And, as Chief Graham indicated, this same reasoning applies to mechanized as well as non-mechanized vehicles.  Indeed, if a group of 50 semi-trailer trucks proceeded *en-masse* from Union Square, the NYPD would require them to obtain a permit too.  And, presumably, cycling enthusiasts would feel safer with such a requirement.

Finally, as the NYPD repeatedly has stressed, no group of 50 cyclists in New York City exists in a vacuum.[75]  Independent groups of 50 cyclists, each of which, taken alone, might have a small impact, may find themselves riding along the same or similar routes at the same time, thus concentrating and increasing their overall impact on safety and traffic.  They may venture into areas with other unusual traffic or road conditions, public gatherings and events, and other circumstances resulting in difficulties and dangers attributable to the combination of factors.  Having information in advance on each group's route, as well as the ability to coordinate the groups'

---

[72]
    DX AAAA (Gannon) at 3.

[73]
    *Id.* at 2-3; Caneco Dep. 171:21-73:3.

[74]
    DX AAAA (Gannon) at 2-3; DX CCCC (Graham) at 4.

[75]
    DX AAAA (Gannon) at 4.

movements, enables the NYPD to prevent such occurrences.[76]  It was in part precisely this lack of advanced coordination that led to the chaos of the pre-RNC MCM ride, as thousands of MCM cyclists took an ostensibly route-less ride on a night when hundreds of other demonstrations were taking place.[77]

    The Court credits defendants' testimony that there is a direct correlation between specific knowledge of the myriad variables that might affect a ride and the NYPD's ability to protect public safety.[78]  Advance knowledge of the timing and whereabouts of a group ride enables the police to reroute pedestrian and vehicular traffic if necessary, provide the ride with an escort, block other traffic from a designated route to assist the cyclists and the general public[79] and, of course, enforce the traffic rules more effectively.  Such knowledge allows the NYPD also to alert emergency providers such as the Fire Department of an event, ensuring that appropriate access is available should an emergency arise.[80]

    The importance of advance knowledge and the coordination of events that it allows extends beyond better policing and increased safety of the events themselves.  Deputy Chief Graham testified that the NYPD "polices large-scale events by preparing for the worst and hoping for the

---

[76]

    DX CCCC (Graham) at 4; *see also* Anger Dep. 182:7-14.

[77]

    *Id.* at 4; Scagnelli Dep. 224:13-17.

[78]

    DX AAAA (Gannon) at 3.

[79]

    *Id.* at 2-3.

[80]

    *Id.*

best."[81]   Commissioner Kelly echoed this, explaining that police have outnumbered MCM riders at times because it is difficult for the NYPD to predict how many riders will participate.[82]

    In sum, a permitting system that informs the NYPD of the route to be traveled and other pertinent variables such as the anticipated number of participants reduces the department's need to rely on luck and enhances its ability to assign the appropriate resources to each event.[83] Armed with this rudimentary information, the NYPD can coordinate the movements of various groups of different sizes and ensure that they proceed at times and places where their impact on each other, other users of the roadways, and the City as a whole is kept to a minimum.  Moreover, such a scheme allows the department to accomplish these goals more efficiently than otherwise would be possible and obviates the need for resource-depleting guessing games.  When the department lacks such information, it "is forced to assign additional resources to cover a larger geographical area where the parade may travel to."[84]  This inefficient allocation of resources undermines the department's effort to provide for the public safety of the City as a whole.

---

[81]

  DX CCCC (Graham) at 2.

[82]

  Kelly Dep. 147:22-148:11.  *See also* DX AAAA (Gannon) at 4; Turco Dep. 307:10-308:20 (explaining that police assign the disorder control unit to MCM rides because the police  lack information on what the rides will be like from month to month).

[83]

  DX CCCC (Graham) at 2; *see also* DX AAAA (Gannon) at 2-3.

[84]

  DX CCCC (Graham) at 4.

D.      *Plaintiffs Claiming Selective Enforcement and Retaliation*

Certain individual plaintiffs contend that defendants violated their Fourteenth Amendment right to equal protection of the law by selectively enforcing traffic and other laws against them for the purpose of suppressing and retaliating for First-Amendment-protected expressive activity.  These claims are premised on the theory that the NYPD shifted from a more hands-off approach to an enforcement strategy in August 2004 not for legitimate law enforcement reasons, but to suppress and retaliate against MCM participants for protesting the RNC.  Since then, in plaintiffs' submission, the NYPD has waged a campaign of constitutionally impermissible enforcement and retaliation "in a systematic attempt to suppress" MCM.[85]

1.      *Nelson, Shura and Son*

Plaintiffs Nelson, Shura and Son all participated in their first MCM rides after August 27, 2004.[86]

Ms. Nelson first did so in October 2004, and took part in several rides before she was arrested during the February and December 2005 rides for parading without a permit and disorderly conduct.  She received summons for an improperly-mounted tail light and failing to keep to the right in the November 2006 and May 2008 MCM rides, respectively.[87]

Ms. Shura's first MCM ride was in September 2004.  She was arrested during the October 2004 ride for disorderly conduct and parading without a permit.  She then participated in

---

[85]
    Am. Cpt. ¶61.  *See also* ¶¶ 69, 70, 79, 80, 82.

[86]
    PTO ¶¶ 6-8.

[87]
    *Id.* ¶ 6.

the November and December rides that year and at least one ride after that.  She has not participated in a group bicycle ride since May 2005.[88]

Mr. Son began riding in MCM rides in 2005 and received a summons for riding through a steady red light during the February 2006 MCM ride.[89]   He then participated in MCM rides through 2007, explaining that  he considered it "a duty to ride in Critical Mass" and that he was "not dissuaded by ticketing."[90]

2.     *Blythe*

Ms. Blythe participated in MCM rides from 2001 to 2005.  She was arrested for disorderly conduct and parading without a permit during the July 2005 MCM ride and has not attended a ride since.[91]

3.     *Gosciak*

Mr. Gosciak, a member of 5BBC, participated or sought to participate in MCM rides from January through November 2004.  He observed a ride in May 2006 and rode in the March 2009 ride.  Gosciak never has been arrested or given a summons while participating in an MCM ride.[92]

---

[88]

*Id.* ¶ 7.

[89]

*Id.* ¶ 8.

[90]

DX NNN (Son) ¶ 25.

[91]

PTO ¶ 4.

[92]

*Id.* ¶ 5.

*E.*     *Prior Proceedings*

Plaintiffs commenced this action on March 27, 2007.  As noted above, they unsuccessfully sought a preliminary injunction barring the City from enforcing the Parade Regulations as amended against group bicycle rides.[93]   Plaintiffs persist in their challenge to the Parade Regulations.  The Court assumes familiarity with the findings and conclusions on their unsuccessful motion for a preliminary injunction.  The Court begins its discussion, however, with plaintiffs' additional claims of selective prosecution and retaliation, claims not addressed by this Court previously.

## II.   Discussion

*A.*     *Selective Enforcement*

Four individual plaintiffs assert that defendants selectively enforced the laws against them based on their "exercise of their First Amendment right to associate with other bicyclists in MCM, with the intent to inhibit them from taking part in MCM even when they do so in a safe, lawful manner."[94] Plaintiffs, however, have conflated and interwoven the four individual plaintiffs'

---

[93]     *5BBC I,* 483 F. Supp.2d at 360.

[94]     Pl. Post Tr. Mem. P20.

Plaintiff Kenneth Jackson has never participated in a Critical Mass ride.  Any claim of selective enforcement brought by him thus fails as a matter of law.

While plaintiff Gosciak nominally claims selective enforcement, the claim is baseless because there is no evidence that the NYPD ever engaged in any enforcement action against him.

claims with the unpleaded suggestion that MCM itself, whatever exactly that means, and/or its participants generally were victims of unconstitutional selective enforcement.[95]  This admixture of claims has resulted in confusion and an almost entirely perfunctory focus on the personal claims of the four individual plaintiffs.  I will begin the discussion with the claims of those individual plaintiffs and then turn to the broader and unpleaded suggestion regarding MCM generally.

### 1.   *Individual Selective Enforcement Claims*

Claims of selective enforcement are grounded in the Equal Protection Clause, which "requires that the government treat all similarly situated people alike."[96]  To succeed on a such a claim, a plaintiff must show that:  (1) "he was treated differently than others similarly situated" and (2) that "'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'"[97]

The first element of a selective enforcement claim requires a plaintiff to show that "(1) the persons to whom . . . [he] compares himself . . . [are] similarly situated in all material respects, and (2) that Defendants knew there were similarly situated individuals and consciously

---

[95]

See, e.g., Am. Cpt. ¶ 61 ("following the RNC, the NYPD has engaged in a systematic attempt to suppress Manhattan Critical Mass"); ¶ 125 ("[d]efendants have engaged in selective enforcement of the traffic and other laws against Critical Mass participants in an attempt to suppress Critical Mass...."); Pl. Post Tr. Br. at 2, 10, 18, 20, 23 ("[d]efendants selectively enforced the law against MCM").

[96]

Cobb v. Pozzi, 363 F.3d 89, 110 (2d Cir. 2004) (quoting Harlem Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001)).

[97]

Bray, 2005 WL 2429504 at *4  (quoting Freedom Holdings Inc. v. Spitzer, 357 F.3d 205, 234 (2d Cir. 2004)).

applied a different standard to plaintiff."[98]   In order to prevail, "the level of similarity between plaintiffs and the persons with whom they compare themselves must be extremely high."[99] "[S]imilarly situated" means "similarly situated in all material aspects."[100]  And while "[e]xact correlation is neither likely nor necessary," the "cases must be fair congeners."[101]  In short, "apples should be compared to apples."[102]

### a.    Treatment Different from those Similarly Situated

As an initial matter, none of the individual plaintiffs who assert that they were victims of selective enforcement (Blythe, Nelson, Shura and Son) even has attempted to demonstrate – let alone proved – the existence of others situated similarly to themselves at the times they were arrested and/or given a summons.  Nor has any of them shown that any such similarly situated person was ignored or otherwise treated differently by police.

In substance, the individual plaintiffs implicitly suggest that many MCM participants have been victims of selective enforcement for reasons related to the RNC protests so that they too

---

[98]

  *Abel v. Morabito*, No. 04 Civ. 07284 (PGG), 2009 WL 321007 at *4 (S.D.N.Y. Deb. 10, 2009) (internal quotations and citations omitted).

[99]

  *Huth v. Haslun*, 628 F. Supp.2d 425, 430 (S.D.N.Y. 2008) (quoting *Skehan v. Village of Mamaroneck*, 465 F.3d 96, 110 (2d Cir. 2006)).

[100]

  *Richardson v. Newburgh Enlarged City Sch. Dist.*, 984 F. Supp. 735, 746 (S.D.N.Y. 1997) (internal quotation and citation omitted).

[101]

  *Penlyn Dev. Corp. v. Inc. Vill. of Lloyd Harbor*, 51 F. Supp. 2d 255, 264 (E.D.N.Y. 1999).

[102]

  *Estate of Morris v. DaPolito*, 297 F. Supp. 2d 680, 686 (S.D.N.Y. 2004) (quotation and citation omitted).

27

must have been victimized in a like manner on other occasions. This attempt to short circuit the requirement that similarly situated people have been treated differently is unpersuasive and inadequate. But this is not the only flaw fatal to their claim.

> b.    *Improper Motive*

Even if the individual plaintiffs had demonstrated that they were treated differently than others similarly situated, their claim still would fail because there is no persuasive evidence that any officer who enforced or sought to enforce traffic or other laws against Blythe, Nelson, Shura or Son did so out of any improper motive. These plaintiffs' conclusory and unsubstantiated claims of improper motive[103] amount to their swearing that they are right and the NYPD wrong and is of no evidentiary value. Indeed, the only attempt at making a direct connection between the RNC rides and the enforcement against the individual plaintiffs came from Ms. Shura, who claimed that she was "questioned [after her arrest] about . . . whether [she had] been arrested at the recent Republican National Convention."[104] While this perhaps suggests that the particular officer who asked her the question had the RNC on his mind, I decline to find that the officer arrested her because she had participated, or was thought to have participated, in the RNC-related events. The link is just too tenuous to credit. The rest of the plaintiffs did not even offer this much.

In sum, none of the four plaintiffs has persuaded the Court that others similarly situated received different treatment or that any alleged differential treatment was driven by a desire

---

[103]

> *E.g.*, PX 287 (Blythe) at 7 ("I believe that the only reason for my arrest was that the police believed I was associated with Critical Mass.").

[104]

> PX 285 (Shura) at 4.

to suppress plaintiffs' speech or other protected activity.  Their individual claims thus fail.

### 2. Selective Enforcement Against MCM and/or its Participants Generally

There are several fundamental problems with plaintiffs' unpled often implicit and sometimes explicit assertions that defendants engaged in selective enforcement against MCM and its participants generally.  Not least of them are the facts that (1) MCM is not and could not be a plaintiff here because it is not a legal entity with the capacity to sue, and (2) the individual plaintiffs lack standing to assert any claims of persons who have not joined in the action.[105]  Nonetheless, in light of the extensive trial record the Court turns to plaintiffs' broader claims of selective enforcement.

### a. Treatment Different from others Similarly Situated

#### (1) Similarly Situated

Plaintiffs' broader selective enforcement claim fails at the outset because they have not established that there is any group ride comparable in any relevant constitutional sense to MCM.

Perhaps the most significant difference between MCM and other group bicycle rides, including BCM, has been the conduct of a material number of MCM riders and the consequent disruptions and dangers.  MCM riders have blocked emergency service vehicles from proceeding through traffic on a number of occasions since at least 2004.[106] Some MCM riders have had

---

[105]

> Carlen v. Department of Health Servs., 912 F. Supp. 35, 42 (E.D.N.Y. 1996) ("As a general rule, a litigant has no standing to assert the constitutional rights of others.") (citing Warth v. Seldin, 422 U.S. 490, 499 (1975)).

[106]

> See supra p. 10, 18 & nn. 37, 69.

aggressive and even violent confrontations with motorists and police.[107]  MCM rides have been

occasions for mass violations of traffic laws involving hundreds and even thousands of cyclists.[108]

Even fellow cyclists, including some plaintiffs' witnesses, have testified to the aggressive and

dangerous tendencies displayed at MCM rides which, again, plaintiffs have not successfully ascribed

to any other group ride.[109]

> Seemingly aware of this, plaintiffs attempt to treat pre-RNC MCM rides as an

appropriate comparator for post-RNC rides.  They argue that MCM "proceeded in essentially the

same manner both before and after the RNC – without a fixed route, leader, or permit, and on

occasion in a curb-to-curb configuration in violation of traffic rules."[110]  They say that MCM

participants engaged in illegal and even dangerous conduct prior to the NYPD's August 2004 shift

---

[107]

       DX DDDD (Wagner) at 4 (describing various acts of aggression by MCM riders, including banging on the hood and fender of car, threatening a motorist, cursing at a police officer and eluding apprehension by police by weaving in and out of traffic and onto the sidewalk); DX FFFF (DeQuatro) PP 1-2 (describing incident during January 2006 ride in which a bicyclist rode at an NYPD officer, causing the officer to suffer a leg injury); Winksi Dep. 33:5-34:8 (recounting his observation of two cyclists jumping onto the hood of a taxi during an MCM ride); Scagnelli Dep. 225:21-226:15 (describing how while blocked at an intersection by an MCM procession, he got out of his car "begged" to get across and was told "fuck you" by cyclists riding by him); Browne Dep. 137:13-39:5 (describing television footage of an MCM ride in which a cyclist punched a motorist trying to inch into a blocked intersection through the window of the vehicle).

[108]

       *See*, *e.g.*, *supra* p. 9 & n.33.

[109]

       *See*, *e.g.*, DeFreitas Dep. 153:11-54:23 (describing the unpredictable and dangerous actions of some MCM riders); Engel Dep. 94:16-25 (describing "remarkable contrast in tone, attitude, spirit" between MCM and BCM rides); Zisfein Dep. 184:11-17, 187:1-7 (describing aggressive approach of Critical Mass riders, including taking up entire roads, blocking traffic, blocking intersections and taunting motorists).

[110]

       Pl. Post Tr. Mem. 22.

to enforcement[111] and even rode onto the Queensboro Bridge and the FDR Drive on one or two occasions prior to July 2004.[112]  They suggest, therefore, that the difference between the rides pre- and post-July 2004 is only the protest against the RNC.

This argument is unpersuasive.  The July 2004 ride was a turning point in MCM's conduct, as well over a thousand participants threatened public safety and caused massive traffic disruptions by, among other things, illegally riding *en masse* onto the FDR Drive and the West Side Highway.  The record is devoid of evidence that such a massive number of participants in any pre-July 2004 MCM ride engaged in such widespread lawless behavior or created similar risks to public safety.  The decision to change how the police handled MCM rides came in response to the July ride and in preparation for the RNC and hundreds of other related events, a logistical and safety challenge for which the NYPD had been preparing for at least eight months.[113]  The point is precisely that the policy changed because MCM rides had changed – July 2004 marked a break with the past.  Accordingly, the record does not support the contention that pre- and post-RNC MCM rides are fair comparators.  But there are still other material differences between MCM and any other relevant group.

First, MCM rides typically have been much larger than other group rides.  For the

---

[111]

See, *e.g.*, TT 406:1-408:19 (Officer Wagner testifying that he observed MCM participants commit many of the same traffic infractions pre-and post-RNC).

[112]

PX 287 (Blythe) at 3 (claiming rode over the Queensboro Bridge as part of MCM ride in October 2003 and rode on FDR Drive twice as part of MCM rides prior to August 2004). It is important to note that Blythe does not provide any information regarding the number of riders involved in crossing the Queensboro Bridge, and also that the July 2004 FDR incident is precisely what the police claim led to the change in enforcement practices effected in August 2004.

[113]

DC CCCC Graham at 2-3.

years 2005 through 2008 the average number of MCM participants were 200, 170, 89 and 31 respectively.[114]  During the same period, 5BBC held over 500 group rides with yearly averages of approximately 17, 15, 15 and 14 bicyclists per ride, respectively.[115]  And while the gap in the sizes of Manhattan and Brooklyn Critical Mass rides shrunk, particularly in 2007-08, MCM's not-so-distant history of rides numbering in the thousands and then hundreds remains a material difference between the MCM and BCM rides.  There is no evidence, for example, that any BCM ride has exceeded one hundred, let alone one thousand, cyclists.  And the difference in size is of substantial importance, as the size of a group bicycle ride is directly related to the extent to which it disrupts traffic and the need for police to deal with traffic and protect the rights of cyclists and motorists alike, among other factors.

Second, with the exception of BCM, there is no evidence that any other group bicycle ride in New York lacks leaders, organizers and a predetermined route.   In fact, several of the plaintiffs here stressed that these attributes make Critical Mass unique among group rides.[116]  The record overwhelmingly establishes that this is a material difference because it dramatically increases the difficulty of properly policing these rides

Finally, as discussed above, BCM has been characterized by a certain amount of cooperation between riders and the NYPD.  Cooperation on the part of MCM has been conspicuously absent.

In sum, plaintiffs have failed to convince me that any other group bicycle ride is

---

[114]    PTO ¶¶ 16-19.

[115]    *Id.* ¶¶ 54, 56, 58, 60.

[116]    *See* Def. Post Tr. Mem. at 3 (collecting quotes).

sufficiently similar to MCM to make it an appropriate point of comparison for purposes of a selective enforcement claim.

### (2)    Different Treatment

Even assuming that plaintiffs had established the existence of a constitutionally relevant comparator to MCM, they have not established that MCM and its participants were treated differently.

Plaintiffs attempted to prove that MCM rides were subjected to disparate treatment on the basis of a purported statistical analysis by Professor Anthony M. Beveridge, a sociology professor with expertise in "the statistical and quantitative analysis of social science data sets."[117] Professor Beveridge proceeded as follows:

- He reviewed all summonses issued to non-commercial bicyclists in the 13th Precinct, which contains the Union Square starting point for MCM rides, during the two year periods ending (a) January 30, 2006, and (b) February 1, 2008.[118]

- He observed that the number of non-commercial bicycling-related summonses issued on days other than the last Friday of each month, the day of the monthly MCM ride, dropped in the 2006-08 period as compared with the prior two-year period.[119]

_____

[117]    PX 276 (Beveridge) at 1.

[118]    Id. at 1-5.

[119]    Id. at 2.

- He observed also that the number of such summonses issued between 6 and 11 p.m. on the last Friday of each month, the time of the monthly MCM ride, "skyrocketed" in the 2006-08 period and accounted for 80 percent of all summonses issued to non-commercial bicyclists in the 13th Precinct.[120]

- He noted that over 40 percent of the summons issued during the periods of the MCM rides were for two violations "that were ***never enforced*** on any other evening of the month." [121]

- He rejected the possibility that the summonsing activity on the last Friday evening of each month was "attributable to the conduct" of MCM bicyclists because (1) other comparable large group rides did not result in increased summonsing, (2) MCM riders "have no greater propensity to violate the traffic laws than other bicyclists," and (3) the addition of the MCM riders to "the mix of bicycle traffic that would otherwise be found in the Union Square vicinity on Critical Mass evenings is not itself sufficient to account for the heightened summonsing rates on those evenings."[122]

He therefore concluded that (1) the NYPD "pursued an extraordinary campaign [between February 1, 2006 and February 1, 2008] to issue traffic summonses against bicyclists at the one time and place each month that [MCM] occurs, while barely enforcing the laws at all in the same location on other

---

[120]

     *Id.* at 2-3.

[121]

     *Id.* at 3(emphasis is in original).

[122]

     *Id.* at 3-4.

days,"[123] and (2) MCM riders were singled out not for "their conduct or because of public safety concerns intrinsic to large group bicycle rides or Critical Mass rides in general, but rather based on other considerations."[124]

While I accept that the NYPD issued many more summonses to MCM participants in the 2006-08 period than in the prior period,[125] I reject Professor Beveridge's inference that the NYPD was motivated by considerations other than MCM participants' conduct or public safety as well as rest of his conclusions. They rest on flawed methodology, unsupported assumptions, and, in my judgment, were colored by his overly vigorous advocacy of the plaintiffs' position. I find many defects in the analysis and his conclusions, but mention only a few examples.

First, Professor Beveridge's analysis failed to account adequately for confounding variables. As part of his analysis, he compared the numbers of summonses issued in the 13th Precinct on the last Friday evening of each month, when MCM occurs, and other days. But his analysis fails to control for several variables that plainly impact the number of non-commercial bicycle-oriented summonses issued in any area in any given period of time, including, for example, (a) the number of non-commercial bicycle riders present, (b) the percentage of that particular group of riders who commit infractions, and (c) the number of police units on the street and in a position to observe those infractions. In order to draw any reliable conclusions about whether the police

---

[123]

    *Id.* at 2.

[124]

    *Id.*at 10.

[125]

    It is undisputed that the NYPD changed its tactics in 2006 from arresting MCM participants for parading without a license to issuing summonses for traffic infractions. This change in policy was the product of a decision to stop enforcing the parade rules while a legal challenge was pending. *E.g.,* TT 388:9-21.

were selectively enforcing the law against MCM riders, he would have had to control adequately for all of these and doubtless other variables.  With limited exceptions, however, Professor Beveridge did not do so.  Thus, his conclusion that the NYPD selectively enforced traffic regulations against MCM riders is fatally flawed.  He simply had no reliable basis for supposing that a police officer who observed both infractions was any more likely to ticket an MCM participant on a Friday evening near Union Square than the officer was to ticket some other cyclist who engaged in precisely the same conduct on a Tuesday afternoon or evening.

Professor Beveridge's focus on the fact that 80 percent of 13th Precinct non-commercial bicycle-oriented summons were issued between 6 p.m. and 11 p.m. on the last Friday of each month suffers from the same failure to control for confounding variables.  If, for example, more than 80 percent of the non-commercial cycling within the 13th Precinct occurred on MCM evenings, it would be unsurprising – and not suggestive of selective targeting – that eighty percent of summonses occurred during that time.  Moreover, if 80 percent of all such cycling occurred on a single evening each month, it would be quite reasonable to suppose that the NYPD might focus its enforcement activities on that evening, raising the likelihood that the police would witness infractions.  These observations, of course, do not suggest that this is the case.  The point instead is that Professor Beveridge's alarmed focus on the 80 percent figure was misguided because that figure is meaningless without controlling for other pertinent variables.

Second, the analysis relies on unsupported assumptions.  Professor Beveridge points with alarm at the fact that forty percent of the summonses issued during MCM evenings were issued for two violations for which no summonses were issued on any other evening of the month[126] and

---

[126] PX 276 (Beveridge) at 3.

that summonses were issued for some traffic and equipment violations only during Critical Mass rides.[127]   According to Professor Beveridge, these figures "strongly" demonstrate "an attempt to target bicyclists in the vicinity of Critical Mass for enforcement of traffic laws that are rarely, if ever, enforced otherwise."[128]   This conclusion, however, rests on an assumption that these rules were violated with equal frequency at other times, an assumption for which he provides no reliable basis.

These are only two examples of the problems with Professor Beveridge's analysis. More could be said.   But even assuming that his statistical analysis were correct, his ultimate conclusion – viz., that MCM riders were singled out not for "their conduct or because of public safety concerns intrinsic to large group bicycle rides or Critical Mass rides in general, but rather based on other considerations" – would be unpersuasive.

That conclusion rests on two critical premises:   that (1) other comparable large group rides did not result in increased summonsing, and (2) MCM riders "have no greater propensity to violate the traffic laws than other bicyclists."   Neither of these premises withstands scrutiny.

First, there were no group rides that were remotely comparable to MCM.   Certainly none was characterized by the aggressive and willful behavior of a material number of MCM participants.   And, until MCM became smaller in the last few years, none approached its size.   In any case, Professor Beveridge provided no reliable basis for assuming that there was any appropriate comparator.[129]

---

[127]

        *Id*. at 5-6.

[128]

        *Id*. at 3.

[129]

        His comparison of MCM with "the many group bicycle rides that occur during the weekends in Central Park" (*id.* at 9-10) was especially illustrative of his unreliability. Central Park is closed to vehicular traffic on weekends from 7 p.m. on Friday until 7 a.m.

Second, Professor Beveridge provided no basis for his assumption that MCM riders "have no greater propensity to violate the traffic laws than other bicyclists." He never witnessed a Critical Mass ride.[130]  He conducted no research on the group or how its rides compared to other group bicycle rides.[131]  He knew nothing of the size of other group rides in New York City, whether they have leaders or organizations, or to what extent they cooperate with the police.[132]  In short, he had no basis for assuming, as he did, that any high rate of summonsing activity at the times and places of MCM rides was not attributable to high rates of traffic infractions among MCM riders. I find, moreover, that the record establishes the contrary.

In sum, Professor Beveridge's conclusions are unsound and unpersuasive because they rely on unsupported assumptions, are conclusory, and utterly ignore data (or the lack of data) crucial to determining whether what he asserts is true rather than a wishful hunch. He may well be correct that the enforcement pattern he observed "does not reflect a random distribution of summonsing activity and cannot be attributed to chance."[133]  But the absence of chance does not mean that one may ignore relevant variables and other essential factors in order to reach one's preferred conclusion.  Nor does it mean that he may supply a reason for the variance without

---

on Monday.  http://www.centralpark.com/pages/sports/bicycle-riding.html (last visited Feb. 8, 2010).  Even if it were permitted, there is no proper comparison between bicycle riding in Central Park on weekends and on trafficked City streets.

130

He had seen the group only on two videotape excerpts shown to him by plaintiffs' attorneys before trial.  TT 181:6-184:17.

131

Id. 183:17-185:16.

132

Id. 185:24-186:2.  There is one exception.  Professor Beveridge is somewhat familiar with Professor Jackson's nighttime ride.  Id. at 185:6-8.

133

PX 276 (Beveridge) at 3.

adequate basis.

Were Professor Beveridge's opinion offered in a jury case, I would have excluded it under FED. R. EVID. 702 and 703 and *Daubert v. Merrell Dow Pharmaceuticals.*[134]  As this case was tried without a jury, it is sufficient merely to state that I do not find his work reliable or his conclusions credible.

### b.    Improper Motive

Finally, even assuming, *arguendo*, that plaintiffs had established that MCM participants were subjected to greater police enforcement than others similarly situated, their claim still would fail because they have not established that any such action was a product of any impermissible consideration.  I am not persuaded that the NYPD sought to inhibit or retaliate for constitutionally protected activity or acted out of any other improper motive.

Plaintiffs contend that statements by Commissioner Kelly and other police officials provide direct evidence of impermissible animus toward MCM.  They point, for example, to comments Commissioner Kelly made in a 2004 op-ed column that "'extremists'" and cyclists bent on disruption "had 'hijacked' MCM 'as the [RNC] approached.'"[135]  Plaintiffs point also to videotaped statements made by Patrolman Wagner to cyclists at another MCM ride to the effect that the NYPD's enforcement strategy for the group's rides arose from protest activity on August 27, 2004.[136]  Plaintiffs' contentions are unpersuasive.

---

[134]     509 U.S. 579 (1993).

[135]     Pl. Post Tr. Mem. 16 (citing PX 1).

[136]     TT 416:21-418:7; PX 271.

Commissioner Kelly's October 2004 op-ed piece expressed his view that MCM had changed over time.  Correctly or incorrectly, he placed responsibility for that change on people he termed "extremists."  At worst, Commissioner Kelly might have been incorrect, and perhaps even hyperbolic, in his assessment of why the characteristics of the MCM rides had changed.  But the column does not indicate that the NYPD's enforcement strategy was animated by a desire to punish MCM riders for or to deter any protected activity.

Nor is the reliance on Officer Wagner's statement to the bicyclists convincing.  As an initial matter, the NYPD has about 35,000 officers.  I do not disrespect Officer Wagner in pointing out the obvious – patrolmen are the lowest ranking members of the police force and do not make or speak for the department with respect to policy.  In any case, nothing Officer Wagner said betrays either animus or a desire to inhibit or retaliate for protected activity.  Instead, his statement reflected the reality that the NYPD decided it no longer would tolerate events like the July 2004 ride, particularly not on a night when the City would be full of political demonstrations, potential traffic disruptions and the logistical challenges and safety risks that accompany any large-scale national event held in New York.  None of these concerns had anything to do with any expressive aspect of the August 27, 2004 MCM ride or any ride thereafter.

The only direct evidence on the subject of the NYPD's motive for changing tactics cuts against plaintiffs.  The three highest ranking NYPD officers who appeared at trial all testified that they never based any of their actions *vis a vis* MCM on any viewpoint attributed to  it.[137]  The Court credits this testimony, as well as the NYPD's explanation that the department, in the wake of

---

[137]  *See* TT 294:22-296:5 (Chief Paragallo); 379:2-15(Chief Tuller); 401:8-402:11 (Deputy Inspector DeQuatro).

40

the July 2004 ride, decided that its strategy for policing MCM events no longer was the best approach, particularly in light of the challenges posed by the upcoming RNC. The scooter task force of fewer than a dozen officers no longer was adequate, and the NYPD elected to pursue violations rather than monitoring MCM rides in a more hands-off manner.

Plaintiffs next argue that a retaliatory motive should be inferred from the fact that "after months of condoning and facilitating" illegal activity by MCM, the department moved to "zero-tolerance" on August 27, 2004 because the MCM participants were protesting the RNC.[138] This argument suffers from several problems.

First, plaintiffs have not established that the August 27, 2004 ride actually was a protest of the RNC. Indeed, in the words of at least one plaintiff, the August 2004 ride "*coincidentally* took place during" the RNC.[139]

Second, even assuming *arguendo* that MCM or the named plaintiffs participated in MCM that night to protest the RNC, plaintiffs ignore the wealth of evidence, which I accept, that the motive behind the new enforcement strategy that night and afterwards was not the suppression of whatever political message plaintiffs claim to have been expressing. It was ensuring public safety and preventing major traffic disruptions.

Third, the Court does not credit plaintiffs' characterization of the NYPD's prior practice in dealing with MCM rides as "condoning and facilitating" acts of lawlessness such as riding onto the FDR Drive and riding over the Queensboro Bridge. That characterization is belied by credible police testimony that such violations at previous rides did not draw enforcement action

---

[138]   Pl. Post Tr. Mem. 17.

[139]   PX 287 (Blythe) at 4 (emphasis added).

41

because of a combination of a lack of officers assigned, the smaller scale of the violations, and the resulting belief on the part of the officers that the best way to deal with these violations was to try and contain the ride.

In sum, the Court credits that the July 2004 MCM ride marked a turning point in the NYPD's assessment of how that ride should be handled to protect safety and ensure the orderly flow of traffic.  Moreover, the Court rejects as unsupported plaintiffs' claim of a "pattern of antagonism against MCM" and an "ongoing campaign of adverse action" against MCM riders that indicates a "hostility toward them and a desire to stamp out the event altogether."[140]  Plaintiffs mistake the NYPD's continued presence at MCM rides as a sign of hostility and impermissible enforcement of the law and a desire to "eradicate" the event itself.  On the contrary, the record indicates that the NYPD has attempted not to eradicate MCM, but to permit it to go forward while bringing it under an appropriate degree of control and making it predictable to permit appropriate police activity.  Prior to the August 2004 ride, the NYPD reached out to Transportation Alternatives, a bicycle advocacy organization, in an effort to facilitate that month's MCM ride and avoid the confrontation that ultimately took place.[141]  The NYPD made similar efforts after that ride.[142]  Moreover, in the same op-ed piece cited by plaintiffs as evidence of animus to MCM, Commissioner Kelly expressed his department's willingness to work with MCM participants to facilitate the group's rides and

---

[140]
      Pl. Post Tr. Mem. 18.

[141]
      PX 3.

[142]
      *See e.g.*, Scagnelli Dep. 237:3-40:2.

encouraged riders to work with the NYPD to obtain a permit.[143]   Subsequent statements by the NYPD, including Commissioner Kelly, indicate that the NYPD remains willing to work with MCM.[144]

It is true that the NYPD has not been entirely consistent in its explanation of its zero tolerance[145] policy of issuing summonses for traffic infractions at MCM rides.  Inspector DeQuatro, for example, testified that officers issued summonses in this fashion to deter the specific violation for which each rider was summonsed and not as a proxy for charging the rider with violating the Parade Regulations.[146]  Chief Anger, however, explained that NYPD's enforcement at MCM rides exists because:

> "Critical Mass has a history of obstructing roadways and the movement of vehicles and pedestrians, and they don't - - Critical Mass does not wish to discuss their route or their objective of riding in the roadway with the Police Department, where we work with other groups that we can accommodate."[147]

Chief Anger's statement  suggests that at least part of the reason for policing MCM rides strictly is the safety and traffic concerns raised by the participants' failure to comply with the Parade Regulations, even if the riders are not actually summonsed or arrested for that violation.

But any inconsistency by the NYPD on this issue ultimately is beside the point.  Even

---

[143]

   PX 1.

[144]

   DX CCCC (Graham) at 2-3; Kelly Dep. 105:21-23.

[145]

   According to Inspector DeQuatro, "zero tolerance" in the context of MCM rides meant that when officers observed a traffic violation, "they were to issue a summons regardless of who committed the violation."  TT 383:2-10.

[146]

   TT 389:16-390:11.

[147]

   Anger Dep.  112:6-13.

if inducing compliance with the Parade Regulations were part of the department's motivation for assigning a detail of officers to and enforcing traffic violations during MCM rides, that would not be a constitutionally impermissible motive.  Far from it.  Whatever inconsistences may exist in its description of its enforcement policy, there is no convincing evidence that the NYPD polices the MCM ride to restrict or hinder the participants' speech or to retaliate for any message the group may have expressed in the past.  Indeed, the police witnesses repeatedly made clear that their goal in policing MCM rides since 2004 has been public safety and control of traffic.[148]  Chief Anger's testimony itself supports the view, credited by the Court, that the NYPD's central motive in policing MCM has been and continues to be ensuring public safety and avoiding traffic disruptions.[149]

B.      The First Amendment Retaliation Claim

"The elements of a First Amendment retaliation claim depend on the factual context of the underlying allegations."[150]  The test applicable here is that elucidated in *Curley v. Village of*

---

[148]

    *See, e.g.*, TT: 295:4-7 (Chief Paragallo testifying that officers were assigned to MCM details "to ensure the safety of both the participants and the general public . . . and to ensure . . . the free flow of traffic . . . ."); TT 377:20-22 (Chief Tuller testifying that NYPD's goals in policing MCM are "to ensure the safety of everyone at the location, and primally to ensure that the traffic regulations are obeyed"); Kelly Dep. at 78:14-17 (testifying that the NYPD's "strategy has been consistent in that we devote sufficient resources to protect the public and to the best we can protect the riders from injury.").

[149]

    Anger Dep. 111:9-15 (When asked what the purpose is of conducting enforcement against MCM riders, Anger responded, "To ensure public safety . . . By enforcing vehicle and traffic regulations or any other type of criminal behavior.  For the safety of the general public, pedestrians, motor vehicles and bicycles.").

[150]

    *Richardson v. New York City Health and Hospitals Corp.*, No. 05 Civ. 6278 (RJS), 2009 WL 804096, *19 (S.D.N.Y. Mar. 25, 2009) (quoting *Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008)).

*Suffern*.[151]   A plaintiff must establish (1) an interest protected by the First Amendment; (2) that defendants' actions were motivated or substantially caused by his exercise of that right; and (3) that defendants' actions effectively chilled the exercise of his First Amendment right.[152]   This claim may be disposed of briefly.

For reasons discussed already, I find that the defendants' actions with respect to the plaintiffs and, more broadly, MCM and its participants were not motivated or substantially caused by any activity protected by the First Amendment.   To the contrary, the motive was to ensure the safety of the public and the riders alike.

C.       *Vehicle and Traffic Law Section 1231*

Section 1231 of the VTL provides in relevant part as follows:

"Every person riding a bicycle . . . upon a roadway shall be granted all of the rights and shall be subject to all the duties applicable to the driver of a vehicle by this title, except as to special regulations in this article and except as to those provisions of this title which by their nature can have no application."[153]

Plaintiffs seem to proceed on the theory that a bicyclist or a group of bicyclists is entitled under this statute to occupy one or more full lanes of traffic since an automobile or truck may occupy a full lane of traffic.   Accordingly, they argue, defendants are liable for requiring that bicyclists keep to the side of the road and for issuing summonses for their failure to do so.   They are mistaken.

---

[151]   268 F.3d 65 (2d Cir. 2001).  *See also Morrison v. Johnson*, 429 F.3d 48, 51 (2d Cir. 2005) (noting that the Curley standard governs a claim by "a private citizen who allege[s] that, in retaliation for criticizing the actions of certain public officials, he [or she] was arrested.").

[152]   *Curley*, 268 F.3d at 73.

[153]   N.Y. VEH. & TRAF. L. § 1231.

As an initial matter, plaintiffs' assertion that there is a private right of action for violation of Section 1231, if violation there had been, is doubtful.  There is no reason to believe that the New York Legislature, in enacting the statute, intended to create a vehicle for private enforcement.[154]  But a conclusion on that point is unnecessary to decide this case.

Section 1120(b) of the VTL, with exceptions not here relevant, provides that "any vehicle proceeding at less than the normal speed of traffic . . . shall be driven in the right-hand lane then available for traffic, or as close as practicable to the right-hand curb or edge of the roadway" except when passing another vehicle or preparing to make a left turn.[155]  Since bicyclists typically proceed at less than the normal speed of traffic and are subject to the same duties as motorists, Sections 1120(b) and 1231, read together, require that bicycles ride as close as practicable to the right-hand curb or edge of the roadway except where there is no faster traffic in the right-hand lane or when preparing to make a left turn.[156]  In any case, no plaintiff in this case has established that he or she was injured by any enforcement action taken by virtue of an alleged failure to keep to the right.

D.      *The Parade Regulations*

1.      *Right to Travel*

---

[154]

See *Sheehy v. Big Flats Community Day, Inc.,* 73 N.Y.2d 629, 633-34, 541 N.E.2d 18 (1989) (court will infer private right of action for violation of statute only where "creation of such a right would be consistent with the legislative scheme").

[155]

N.Y. VEH. & TRAF. L. § 1120(b).

[156]

Local New York City rules permit bicyclists to ride to the left on one-way streets at least 40 feet wide.  RCNY § 4-12(p)(3).

The evidence adduced since its previous ruling on plaintiffs' right to travel claim has further convinced the Court of the claim's lack of merit.[157]  Indeed, the trial made clearer that they would still pass constitutional muster even assuming *arguendo* that the Parade Regulations impinged on the right to travel because the Regulations are necessary to promote the compelling governmental interest of ensuring that group bicycle rides of fifty riders proceed safely in one of the busiest cities in the world.

The only arguably new development is plaintiffs' contention that the Parade Regulations' fixed route requirement effectively bans open route rides of fifty or more participants, such as Critical Mass and certain 5BBC rides, because these rides by their very nature allegedly cannot meet the Parade Regulations' requirements.

The short answer to this contention is that requiring group rides of fifty or more to select a route by which they will travel is not the same as forbidding or deterring travel or punishing someone for moving about.  A restriction on the number of cyclists who may ride together through the City's streets without advance notice of their route is not an unconstitutional burden on the right of cyclists who prefer to travel in a free form manner.  They remain entirely free to travel as they wish provided only that they do so in groups of 49 or fewer riders.  Moreover, the record demonstrates that open-route rides of over fifty, such as MCM rides, present a unique challenge to police assigned to ensure the safety of participants as well as those around them, and to do so efficiently.

---

[157]   *See 5BBC I,* 483 F. Supp. 2d at 361-65.

    2.    *Freedom of Association*

It remains undisputed that some participants in group rides take part in order to express a point of view.  To this extent, the activity is expressive association protected by the First Amendment.[158]  Accordingly, the operative question remains whether the Parade Regulations impose a direct and significant burden on plaintiffs' associational rights so as to trigger the compelling interest test.  The answer remains no.[159]

Plaintiffs continue to assert that spontaneity is an "an important aspect of expressive association among bicyclists"[160] and that  the requirement that permit applications specify the route group ride will take stifles such spontaneity.  According to 5BBC president Edward Ravin:

> "flexibility to spontaneously modify the route during a day trip is not a mere enhancement or added attraction of the group experience provided by 5BBC day trips; it is a central element of how the leader manages the ride to ensure that everyone completes the ride safely and enjoyably.  If our rides were not safe and enjoyable we would have no participants coming to ride with us, and it would essentially put us out of business."[161]

Mr. Ravin's testimony is aimed squarely at this Court's analysis of the same argument in *5BBC I*.[162]  Notwithstanding his claim, however, the Court remains unpersuaded that

---

[158]

    *See 5BBC* I, 483 F. Supp. 2d at 365.

[159]

    A full trial provided no reason for the Court to alter its original conclusion that the Parade Regulations do not infringe plaintiffs' right to expressive association by "limiting the size of the group" or by prohibiting the use of portions of Fifth Avenue by groups of 50 or more.  Pl. Mem. at 34; Am. Cpt. ¶ 88.  *See 5BBC I*, 483 F. Supp. 2d at 366 (discussing both issues).

[160]

    Pl. Mem. 34.

[161]

    PX 279 (Ravin) at 7.

[162]

    *See 5BBC I*, 483 F. Supp 2d at 366-67.

spontaneity is a crucial element of 5BBC's message or a necessary or even important means of expressing it.  His view is belied by former 5BBC president Edward DeFreitas' testimony that the club does not encourage ride leaders to make up rides as they go along and that he is unaware of any 5BBC rides that are not planned out in advance.[163]  Furthermore, Mr. Ravin's implication that the permit restrictions' effect on spontaneity could drive 5BBC out of business is not credible given the testimony from various witnesses that they had observed no negative impact on 5BBC since the relevant restrictions came into effect.[164]

On the other hand, spontaneity is important to the message for some participants in MCM rides.  Plaintiff Madeline Nelson, for example, testified "probably would not participate in Critical Mass" if she were "forced to accept a fixed route or the leadership and decision-making structure that a fixed route necessarily would entail."[165]  Nevertheless, plaintiffs have offered no evidence sufficient to alter the Court's original conclusion on the matter.  They presume, without explanation, that a fixed route would "necessarily entail" the kind of leadership and decision-making structure that would suppress or undermine MCM's "pro-bicycling message."[166]  Moreover, as the

---

[163]

    DeFreitas Dep. at 103:16-104:10.  In addition to being a former president, DeFreitas has been a member of 5BBC since 1982 and has led over 450 5BBC rides.  PX 278 at 1.

[164]

    DeFreitas Dep. 194:14-195:23 (has never cancelled or changed one his group rides because of the Parade Regulations), 207:2-15 (no knowledge of Parade Rules decreasing the number of 5BBC rides or their participants); Garcia Dep. 70:3-16 (has not canceled or altered any of his rides as a result of the Parade Rules, and the Rules have not had a material effect on him as a leader); Zisfein Dep. 170:2-6 (no 5BBC ride that he has led has been reconfigured or canceled as a result of the Parade Rules).

[165]

    PX 280 (Nelson) at 6.  *See also* PX 284 (son) at 2-3 (Regular Critical Mass rider Luke Son stating that "[t]he lack of a fixed route and designated leaders for Critical Mass rides is essential to the nature of the ride.").

[166]

    PX 280 (Nelson) at 6.

Court noted in the context of the right to travel claim, a predetermined route requirement may dissuade some cyclists from participating in group rides of fifty or more but it does not prevent individuals from joining those rides should they choose to do so.[167] Accordingly, the most that can be said is that the predetermined route requirement inconveniences certain cyclists and perhaps makes group rides of fifty or more less attractive or enjoyable to them than they otherwise would be.  It does not impose a direct and substantial or significant burden on cyclists' right to engage in expressive association.

### 3.    Free Speech

Finally, plaintiffs cling to their argument that the Parade Regulations violate their right to free speech.  The Court wrote extensively on this issue in its previous decision.  No evidence at trial alters its conclusion that (1) at least to some extent, the bicycle riding at issue here has an expressive component with First Amendment implications, (2) the Parade Regulations are content neutral and leave ample alternative channels of expression.[168]

The rubber thus again meets the road on the question whether the Parade Regulations are narrowly tailored to achieve what plaintiffs acknowledge is the City's valid and substantial interest in securing the orderly use of public roadways for the safety and convenience of travelers.

---

[167]

    *See Fighting Finest, Inc. v. Bratton*, 95 F.3d 224, 228 (2d Cir. 1996) (no violation of right to expressive association where defendant "did not 'prevent' the [plaintiffs] from associating together nor burden in any significant manner their ability to do so.").

[168]

    *See 5BBC I*, 483 F. Supp.2d at 368-69, 375.  In terms of alternative channels, the Court notes that plaintiffs' new assertion that the regulations act as a bar on open route rides of over fifty riders is well answered by the fact that those who prefer open route rides to express their message still may choose between (1) determining a route before the ride or (2) reducing their route-less ride to 49 or fewer participants.

After a full trial, the answer is an even more solid yes.[169]

### a.        Fifty-Person Threshold

As before, plaintiffs' narrow tailoring argument focuses mainly on the contention that the Regulations' fifty-person threshold is arbitrary and lower than necessary to achieve the City's substantial interest.[170] Their position remains entirely unpersuasive.

In terms of past practice, the Court again concludes that the NYPD's prior handling of group cycling in the City is insufficient to undermine the NYPD's conclusion that the City's substantial interests in safety, efficiency and traffic flow would be achieved less effectively absent the fifty person restriction.  The trial testimony and the evidence submitted by both sides supports this conclusion and demonstrate the Court's point precisely.

For a period of time, the NYPD was able to contain safely MCM's rides without resorting to extensive enforcement, even as those rides grew.  In the summer of 2004, however, the growing size of the rides combined with the increasingly dangerous, disruptive and lawless conduct to mark a tipping point.  The decision to amend the Parade Regulations to include large group bicycle rides to help deal with new challenges, including some amount of behavior that had been tolerated before, was appropriate policing, not a narrow-tailoring violation.  Indeed, to suggest that

---

169

        *See id.* at 368-71.

170

        The Court need not here revisit plaintiffs' narrow tailoring claims regarding the Parade Regulations' 24-hour applicability, Fifth Avenue restriction, and frequency of group bicycle rides.  Plaintiffs paid only the barest of lip service at trial to the 24-hour applicability issue and adduced no additional evidence to undermine the Court's original conclusion on that matter.  *E.g.*, TT 464:5-19.  Likewise, plaintiffs' attack on the Fifth Avenue restriction is weaker than before now because the full record makes clearer the safety and traffic control advantages that come when police know what route a large group of cyclists will take.  And their argument about the frequency of group bicycle rides remains baseless.  *See 5BBC I,* 483 F. Supp.2d. at 373.

the NYPD forever is constitutionally barred from altering its enforcement strategy regarding group bicycle rides because of the department's method of dealing with such rides in the past would be to misunderstand the narrow tailoring concept and freeze in time almost any prior police decision concerning how to police a particular behavior that has an expressive component.

The NYPD acknowledgment that it ceased enforcing the Parade Rules pending the outcome of plaintiffs' constitutional challenge to those rules does not undermine defendants' assertion that the fifty-person threshold furthers a substantial government interest that would be achieved less effectively absent the regulation.  Certainly the temporary enforcement suspension does not support the conclusion that the fifty-person threshold "has been empirically proven unnecessary."

Plaintiffs' argument that the fifty-person threshold is unnecessary because group bicycle rides of fifty or more "enhance safety and do not disrupt traffic"[171] also remains unconvincing.  They continue to rely primarily on Dr. John Pucher, whose trial testimony largely reiterated his previous claims about the purported safety benefits of cycling in large groups[172] as well as the rather conclusory assertions of some of the individual plaintiffs.[173]

---

[171]

Pl. Mem. at 41.

[172]

*E.g.*, TT 212:2-14; PX 282 (Pucher) at 1, 3-4.  Pucher again asserts that the reduced risk of collisions because of increased visibility of larger groups, that group cyclists do not disproportionally disrupt traffic by adding to traffic volume and that because "bicycles take up so much less space than cars and can be maneuvered more easily . . . they pose less of a roadway obstruction for emergency vehicles needing to pass through"and that "[t]here is no evidence that groups of 50 cyclists worsen traffic congestion."  *Id.*

[173]

PX 280 (Nelson) at 9-10 ("when I bicycle in a group I know am safer than when I bicycle alone"); PX (Blythe) 287 at 1 ("it is my experience that riding in a group is much safer than riding alone").

It is worth noting that neither Nelson's not Blythe's testimony regarding their perception that bicycle riding is safer in groups says anything about the number required to increase

The bottom line remains that, even accepting these assertions of safety benefits *arguendo* – which would be only more difficult now, given that so much of the evidence belies Dr. Pucher's assertions – the Court remains unpersuaded that the Parade Regulations are unnecessary to further a substantial government interest.  Large groups of cyclists may well be more visible than individual cyclists and may take up less space than large groups of vehicles, but countervailing factors such as their lack of predictability and their tendency to try to stay together in a moving column, even if this means going through a red light, nevertheless endanger other travelers and disrupt orderly traffic flow.  Their presence may add traffic volume that otherwise would be absent.

This reality was borne out by a video clip of the September 2007 Manhattan Critical Mass ride shown to Dr. Pucher at trial.[174]  As the Court noted at the time, the clip shows a cyclist engaging in dangerous behavior by pulling out and to the right of a motor vehicle that itself was in the process of pulling out of the bike lane to its right.  The biker comes up from the motor vehicle driver's blind spot and passes the motor vehicle on the right just as the motor vehicle begins to pull to the right and out of the bike lane.  I find that the video demonstrates the danger of the cyclist's actions.  PX 183, discussed above, likewise illustrates that the same qualities that may make larger groups of cyclists safer in some respects can have the effect also of increasing the risk of collisions with motor vehicles and disrupting traffic.[175]

### b.    Chief Officer Requirement

---

safety, let alone that groups of fifty or under fail to provide the benefits they are talking about.

[174]    TT 204:10-207:12 (testimony regarding PX 188, stipulated with the title "Video Clip Taken September 28, 2007 in Connection with the Critical Mass Ride that Evening.").

[175]    *See supra* p.17 and n. 67.

Unavailing also is plaintiffs continued argument that the requirement that parade permit applicants designate a "chief officer" is overly burdensome and that it will deter potential organizers of large group rides from applying for permits because they will be fearful of taking legal responsibility for the actions of other riders.[176]  Plaintiffs persist in this argument even after the City's change to the permit application previously noted by this Court, which made clear that it does not regard the language as having any such effect.[177]  Plaintiffs' position is that the City's statement at the hearing and its change of the application form could not prevent the imposition of vicarious liability on the "chief officer" because the City cannot change the language of the Parade Regulations absent legislative action.  The argument is tendentious and unworthy of more extensive discussion.

### III.    Conclusion

As I wrote in ruling on the preliminary injunction, I am sympathetic to plaintiffs' concerns.  In certain circumstances, the Parade Regulations may impose inconveniences on plaintiffs' ability to ride their bicycles through the streets of our City with unfettered freedom.  And if this lawsuit is any measure, the tension that has existed between the NYPD and MCM has not much dissipated in the years since the Court's first ruling.  But, after careful review of all of the

---

[176]

See, e.g., PX 279 (Ravin) at 19 (Edward Ravin expressing his and other ride leaders' concern about "the vicarious civil liability we might face as a chief officer in the event of an injury that one rider might allege was caused by another.").

[177]

See 5BBC I, 483 F. Supp.2d at 374.  At oral argument of the preliminary injunction motion, the City explained that the "chief officer" designated in a permit application is not responsible legally for the actions of other cyclists but rather is intended to be a point person with whom the police can discuss in a meaningful way how the proposed event is going to be handled.  The City subsequently changed the permit application form to clarify this, thus eliminating the possibility that a potential applicant would be deterred from seeking a parade permit.

54

evidence in this case, the Court remains persuaded that the Parade Regulations themselves, and the NYPD's enforcement of them and other relevant statutes, does not run afoul of the Constitution. Accordingly, the amended complaint is dismissed with prejudice.  The foregoing constitute the Court's findings of fact and conclusions of law.


          SO ORDERED.

Dated:          February 16, 2010

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)